**NORMAN G. JENSEN, INC., A/C Calhoun's Collectors Society, Inc., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**C.D. 4846; Court No. 77–1–00113.**

United States Customs Court.

March 3, 1980.

Donohue & Donohue, New York City (John P. Donohue, Joseph F. Donohue and Russell W. MacKechnie, Jr., New York City, at the trial and on briefs), for plaintiff.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Attorney in Charge, Field Office for Customs, New York City Litigation (Sidney H. Kuflik, New York City, at the trial; Madeline B. Kuflik, New York City, on brief), for defendant.

BOE, Judge:

In the consideration of the issues presented in the above-entitled action, the court

has been led into the world of philately, into the industry of printing and graphic arts, and into the science of metallurgy.

The merchandise in question which has prompted such diverse areas of consideration consists of thin rectangular strips of 23K gold, backed with an adhesive coating and protected by a release paper.[1] Each gold strip has a dimension of approximately 11/2″ in width by 2″ in length. On the face thereof a design in a raised figuration consists of the state seal of one of the 13 original American Colonies with the name of the state inscribed immediately below. At the top left of the gold strip there is the lettering *"STAFFA"* followed by the smaller lettering "SCOTLAND". At the bottom left of the strip appears the lettering "23K gold" and laterally opposite thereto, the lettering "postage £6".[2]

The subject merchandise produced and exported by private parties from the United Kingdom was entered at the port of Minneapolis—St. Paul between September 24, 1975 and November 19, 1975. The merchandise was classified upon importation as articles of gold under item 656.10, TSUS, providing:

SCHEDULE 6.—METALS AND METAL PRODUCTS
Part 3.—Metal Products

Subpart G.—Metal Products Not Specially Provided for

Subpart G headnote:

1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.

Articles of precious metal, including rolled precious metal:
Of platinum, including rolled
* * * · platinum . . . . . . . . . . . . . . . * * *
656.10 Of gold, including rolled gold 20% ad val.
* * * Of silver, including rolled
silver . . . . . . . . . . . . . . . . * * *

The plaintiff claims that the subject merchandise properly is classified as postage stamps under item 274.40, TSUS, providing:

1. Plaintiff's Exhibit 7.

2. The word "STAFFA" is underlined in order to indicate the larger lettering. The lettering

SCHEDULE 2.—WOOD AND PAPER; PRINTED MATTER
Part 5.—Books, Pamphlets, and Other Printed and Manuscript Material

* * * * * * *

274.40 Postage and revenue stamps, cancelled or not cancelled, and government stamped envelopes and postal cards bearing no printing other than the official imprint thereon . . . . . . . . . . . . . . . . . . . . . . . . . Free

In the alternative the plaintiff claims the merchandise in question should be classified under item 274.70, TSUS, providing:

Photographs, engravings, etchings, lithographs, and wood cuts, and pictorial matter produced by relief or stencil printing process, all the foregoing, whether bound or not bound, and not specially provided for:
* * * Printed over 20 years at time of importation . . . . . . . . . . . . . . . . . . * * *
Printed not over 20 years at time of importation:

* * * * * * *

274.70 Other . . . . . . . . . . . . . . . 4% ad val.

Or under item 274.90, TSUS, providing:

Printed matter not specially provided for:
* * * Suitable for use in the production of such books as would themselves be free of duty . . . . . . . . . . . . . . . . . . . * * *
Other:

* * * * * * *

Other:
* * * Susceptible of authorship * * *
274.90 Other . . . . . . . . . . . . . . 7.5% ad val.

Or under item 790.55, TSUS, providing:

SCHEDULE 7.—SPECIFIED PRODUCTS; MISCELLANEOUS AND NON-ENUMERATED PRODUCTS
Part 13.—Products Not Elsewhere Enumerated

Subpart A.—Miscellaneous Products

* * * * * * *

790.55 Sheets, strips, tapes, stencils, monograms, and other flat shapes or forms, all the foregoing articles (except articles provided for in item 790.50) which are pressure sensitive, with or without protective liners, and whether or not in rolls . . . . . . . . . . . . . . . . 10% ad val.

"postage £6" indicates the cost of the stamp in the amount of six (6) English pounds.

Or under item 644.52, TSUS, providing:

SCHEDULE 6.—METALS AND METAL
PRODUCTS
Part 3.—Metal Products

Subpart C.—Metal Leaf and Foil;
Metallics

\* \* \* \* \* \* \*

Precious metal leaf, whether unmounted or
mounted on paper or equivalent backing:
Gold leaf:

\* \* \* \* \* \* \*

| 644.52 | Mounted . . . . . . . . . . . . | 3.37¢ per 100 sq. in. + 12.5% ad val. |
|---|---|---|

The merchandise in issue hereafter referred to as Staffa stamps bears the name of the small island of Staffa located approximately 7.8 nautical miles off the coast of Scotland. The island, privately owned and uninhabited, has been developed as a tourist attraction. A boat or ferry carries visitors from the Scottish mainland to the island of Staffa, thence returning to the mainland on the same day. The Staffa stamps are offered for sale on the ferry trip to the island for the sum of six pounds (£6). A letter or card with the stamp affixed thereto may be deposited in a receptacle on the island designated for the collection of such letters or cards bearing the Staffa stamp. Staffa Marine Ltd., operator of the ferry or boat service, collects the letters and cards daily and transports the same to the mainland where a British postage stamp is then affixed and the letter or card thereupon deposited in an official British Post Office for transmission to the respective designated destinations.[3]

I

In the consideration of plaintiff's primary claim that the subject merchandise should be classified as postage stamps under item 274.40, TSUS, the court directs its initial attention to a determination of the meaning of the term "postage stamps" as intended by the Congress in the enactment of the tariff schedules and the concomitant determination whether the merchandise in issue falls within such an intended meaning. Recognizing that in its determination of the meaning of the term "postage stamp" as a matter of law, the court may refer to dictionaries, lexicographic authorities, and texts as well as consider the testimony of witnesses offered with respect thereto, the respective counsel have not been reticent in proffering such advisory counsel and authoritative assistance. *United States v. Brager-Larsen*, 36 CCPA 1, C.A.D. 388 (1948); *Floral Arts Studio v. United States*, 46 CCPA 21, C.A.D. 690 (1958).

The plaintiff, in support of its claimed classification under item 274.40, TSUS, contends that the common meaning attributed to the term "postage stamps" is the meaning of that term as used and understood in the philatelic world and that, in fact, the term as used in the tariff schedules draws its definitive meaning therefrom. In so doing, the plaintiff has presented witnesses, highly respected in the philatelic community, whose testimony as to the meaning of the term "postage stamps," as well as a variety of other terms used in the study and collection of stamps and stamplike items, is restricted solely to the philatelic usage. Thus, it would appear that the plaintiff assumes that the establishment of a specific philatelic meaning of the term "postage stamps," *ipso facto*, causes that meaning to be the common meaning thereof. No testimony or authority, however, has been presented in support of this reasoning.

On the contrary, it is well recognized that in including an article in the tariff schedules, the Congress is deemed to have used the name of such an article in the commercial sense, which, in the absence of evidence to the contrary, shares the same meaning as the common ordinary usage thereof. *United States v. Victoria Gin Co.,*

---

**3.** Plaintiff's witness, Williams, testified that the £6 charge for a Staffa stamp was twice the amount of the British Post Office rate and, accordingly, would entitle a purchaser to have affixed to his letter or card British postage stamps in an additional amount up to £3. R. 337.

The witness further testified that the postal charge for transporting a post card within Great Britain is 7 pence or 9 pence. R. 343.

48 CCPA 33, C.A.D. 759 (1960); *United States v. C. J. Tower & Sons of Buffalo, N.Y.,* 48 CCPA 87, C.A.D. 770 (1961). It is self-evident from the testimony adduced as well as from an examination of the many exhibits received in evidence that the study of philately is a vocation or an avocation, as the case may be, which is specialized in character. Its glossary contains terms the usage of which in many instances is pertinent and refers solely to that field of study. The term "postage stamps," on the other hand, throughout the years has been used in the ordinary course of communication and commerce between peoples of this world. If a distinction might exist between a philatelic meaning of the term "postage stamps" and general common meaning thereof as used in the nonphilatelic world, it is improbable that the Congress intended the term to have a meaning other than the connotation commonly accepted in the everyday social and business communities of our country.

Reference to dictionary and lexicographic definitions of the term "postage stamp" offered in evidence as well as independently consulted by this court indicates the presence of two prerequisites in order to be included within the definition: (1) its issuance or specific authorization by a government, and (2) its issuance as a prepayment of a postal charge.

In *Webster's New world Dictionary of the American Language* (1960) (Defendant's Exhibit F), a postage stamp is defined as:

A *government stamp* to be put on a letter or package as a *sign that the postage has been prepaid* : it is either a small printed gummed label or a design imprinted on an envelope, postal card, etc. [Emphasis supplied.]

In *Funk & Wagnalls New Standard Dictionary of the English Language* (1933) (Defendant's Exhibit C), a postage stamp is defined as:

A small engraved or printed label, *issued by a government,* to be affixed to letters, etc., *as evidence that the amount indicated on the stamp has been prepaid.* [Emphasis supplied.]

In *Black's Law Dictionary* (1968) (Defendant's Exhibit E), a postage stamp is defined as:

A ticket *issued by government,* to be attached to mail-matter, that *represents the postage or fee paid* for the transmission of such matter through the public mails. [Emphasis supplied.]

In *The American Heritage Dictionary of the English Language* (1969) (Defendant's Exhibit B), a postage stamp is defined as:

A small engraved usually adhesive label *issued by a government* and sold in various denominations to be affixed to items of mail as *evidence of the payment of postage.* [Emphasis supplied.]

*The Musson Stamp Dictionary* (1972) (Defendant's Exhibit G) indicates the accepted definition of a postage stamp as:

An authorized document (stamp) in use since 1840 that is affixed to mail of any kind *that governments accept* for transmission *to indicate the prepayment of postal charges.* [Emphasis supplied.]

In the absence of language in the statutory provision in question expressing the intended legislative meaning, it is appropriate that reference be made to sources which may evidence such Congressional intent. *Textile Printing & Finishing Co., Inc. v. United States,* 49 CCPA 24, C.A.D. 789 (1962); *United States v. J. Eisenberg, Inc.,* 43 CCPA 105, C.A.D. 616 (1956). The *Summaries of Trade and Tariff Information* prepared and published by the then United States Tariff Commission, as to the description and use of postage and revenue stamps included under item 274.40, TSUS, provides:

The postage and revenue stamps considered here include such stamps, canceled or uncanceled, and Government-stamped envelopes and postal cards (or stamped paper) bearing no printing other than the official imprint thereon. They may include official stamps and stamped paper of any nation, past or present.

The articles here considered thus consist of two distinct but related types: (1) *Stamps and stamped paper printed by or for national governments to be used for*

*postage and revenue purposes,* and (2) *the same kinds of stamps and stamped paper,* canceled or uncanceled, *collected by philatelists.*

The value of stamps or stamped paper for official purposes is determined by their face value, and that of stamps or stamped paper for collections, largely by their rarity. [Schedule 2, Volume 5 (1970) at 85 (emphasis supplied).]

█ It is clear from the foregoing that, recognizing the variety of stamps collected by philatelists and their possible respective values, it was the intention of Congress to include under item 274.40, TSUS, as duty free, only those postage stamps "printed by or for national governments." By this inclusion, such postage stamps imported into the United States solely for philatelic purposes are afforded the same duty-free treatment as a stamp "to be used for postage and revenue purposes." In the use of the term "postage stamps" under item 274.-40, TSUS, the Congress has not intended to place upon such articles a meaning, as urged by the plaintiff, allegedly arising within the philatelic world. Rather, as indicated by the *Summaries,* the philatelist may enjoy the gratuity of a tariff exemption only if the stamps imported for philatelic purposes are those which have been "printed by or for national governments to be used for postage and revenue purposes."

It is undisputed that the Staffa stamps are produced and sold by private parties without affirmative government authorization of any kind. The plaintiff urges, however, that the absence of a specific prohibition by the government of Great Britain against the issuance and sale of these stamps constitutes an authorization therefor. An examination of the Post Office Act of 1969 by which the Ministry of Posts and Telecommunications and the British Post Office were created for the United Kingdom, serves to evidence the lack of recogni-

tion of the Staffa stamps as postage stamps within the meaning of this legislation.[4] Section 7 of the Act provides:

> 7.—(1) The Post Office shall have power—
>
> (a) to provide postal services (including cash on delivery services) and telecommunication services; * * *. [*Id.* at 6.]

Section 23 of the Act relating to the exclusive privilege of the post office with respect to the conveyance of letters provides explicitly for the sole manner by which letters might be sent and delivered other than by and through the post office:

> 23.— * * * (2) The said restriction is that the power to authorise letters to be sent, conveyed and delivered otherwise than by post and the collection of letters otherwise than by an officer of the Post Office which is conferred by the proviso to subsection (1) of the said section 3 and with which the Post Office becomes invested by virtue of the foregoing subsection *shall not be exercisable except with the consent of, or in accordance with the terms of a general authority given by,* the Minister. [*Id.* at 26 (emphasis supplied).]

No evidence is found in the record indicating the consent of or the general authority given by the Minister of Posts for the use of Staffa stamps in the conveyance and delivery of letters. On the contrary, it is undisputed that in order to permit the conveyance and delivery of a letter within the United Kingdom and/or the jurisdiction of the British Post Office, there must be placed thereon, notwithstanding the Staffa stamp that might have been affixed thereto, a postage stamp evidencing the prepayment of postage chargeable by the British Post Office.[5]

This court, therefore, concludes that the term "postage stamps" as included in item 274.40, TSUS, refers to those stamps "print-

---

4. *Defendant's Exhibit Y.*

5. The Post Office Act of 1969, section 123 provides:

In the foregoing provisions of this Part of this Act, "postage" (except in the expression

"duties of postage"), means postage chargeable by the Post Office, and *"postage stamp" shall be construed accordingly.* [Defendant's Exhibit Y (emphasis supplied).]

ed by or for national governments to be used for postage purposes," a requisite proof which has not been successfully established with respect to the merchandise in issue.

■ The foregoing discussion of the court has been premised upon the assumption that the philatelic meaning of the term "postage stamps" might be other than that which the court has found to be the proper common meaning of the term for tariff purposes. From the evidence adduced herein, however, this court is of the opinion that a variance in meaning in fact does not exist. Although the testimony of the witnesses in behalf of the respective parties is in part conflicting, the court is satisfied that the very evidence presented by the plaintiff fails to support a contrary conclusion.

Mr. L. N. Williams, a highly respected philatelic authority, testifying in behalf of the plaintiff that the Staffa stamps are postage stamps in a philatelic meaning and usage, predicates his conclusion on: (1) the fact that the Staffa stamps perform the function of a postage stamp, i. e., they serve as evidence of prepayment of a charge for the carriage of mail, and (2) that notwithstanding the island of Staffa is uninhabited, a need for a mail service therefrom to the mainland exists. Mr. Williams, in support of his characterization, states that the term "postage stamp" is a generic term. He significantly adds, however, that in the philatelic world, the Staffa stamps are referred to and, accordingly, specifically designated as private local stamps or local stamps. In viewing the total evidence presented in its full context, including the impressive testimony of defendant's witnesses, and in the examination of the many exhibits and source materials introduced by the respective parties, the court is of the opinion that in the philatelic world the terms private local stamp and local stamp possess a different and distinct meaning from that of a postage stamp. It most clearly appears that the foregoing terms are not synonymous in the philatelic world in that by their very restrictive and specific

designation their origin, use and character, private local stamps and/or local stamps describe an article recognized as constituting a singular classification in itself.

*Scott's 1978 Standard Postage Stamp Catalogue*, one of the foremost authoritative sources in the philatelic world, in its preface to volume 1, entitled "Information for Collectors," categorizes the variety of stamps, other than postage stamps, in which a collector may be concerned or interested:

## CINDERELLAS AND FACSIMILES

*Cinderella* is a catchall term used by collectors of phantoms, fantasies, *bogus items*, municipal issues exhibition seals, local revenues, transportation stamps, labels, poster stamps, etc. Cinderellas are not issued by any national government for postal purposes. Some Cinderella collectors include local postage issues, telegraph stamps, essays and proofs, forgeries and counterfeits.

A fantasy is an adhesive created for a nonexisting stamp issuing authority. Fantasy items range from imaginary countries (Kingdom of Sedang or Principality of Trinidad) to nonexisting locals (Winans City Post), or nonexisting transportation lines (McRobish & Co.'s Acapulco-San Francisco Line). On the other hand if the entity exists and might have issued stamps or did issue other stamps, the items are *bogus* stamps. These would include the Mormon postage stamps of Utah, S. Allan Taylor's Guatemala and Paraguay inventions, the propaganda issues for the South Moluccas and the adhesives of the Page & Keyes local post of Boston.

Both fantasies and *bogus issues* are sometimes called phantoms. [*Id.* at xi (emphasis supplied in part).] [6]

It is worthy of note that in *Scott's Standard Postage Stamp Catalogue* all stamps listed therein in the main are postage stamps having been issued by and/or under the

6. Plaintiff's Exhibit 21.

authority of a recognized existent government.[7]

In that portion of *The Stamp Collector's Handbook* introduced into evidence by the defendant, we find a more specific definition of the term "bogus items" referred to previously in the aforecited quotation from Scott's Catalogue:

*Bogus Stamps*

*Stamps which have not been issued by a recognized or existent government.* Most are of private origin, especially for disposal to collectors. This kind of material is not to be classified as stamps. They are in the category of labels and philatelically are seldom worth more than the paper on which they are printed. Examples are Bolivian Railway Issue, and some unauthorized Confederate Stamps.[8] [Emphasis supplied.]

With respect to the terms private local stamps and local stamps, which plaintiff's witnesses testify are the specific designations of the Staffa stamps, *The Stamp Collector's Handbook* makes the following explanation:

*Private Issues*

These are divided into two classes. Those with the sanction of the government such as local issues and the U.S. 1864–1899 Match and Medicine Revenue Stamps. In this category may also be included Telegraph, Aviation, Welfare and other stamps serving private interests. In the other group are those which have been privately made as labels, poster stamps, and facsimiles designed to imitate or resemble regular stamps.[9]

As previously indicated herein, recognized authoritative standard postage stamp catalogues, whether British or American, do not include private local issues for the reason that they are not valid as national or international postage stamps. It is only in some specialized compilations, therefore, that local or private issues are so included. One such specialized compilation is the *Catalogue of British Local Stamps* by Gerald Rosen.[10] Contained in this compilation, devoted only to local stamps, is a Report of the Stamp Trade Standing Committee—British Private Local Issues, providing in pertinent part:

These are produced by owners of British Islands to prepay the cost of ferrying letters and parcels to the nearest point on the mainland. *They are not valid for national or international postage, and the British Post Office does not recognise them as postage stamps.* Nevertheless, some islands, such as Herm and Lundy, have been producing these locals for over 30 years, and they appear to have been of interest to visitors. Other islands have started within the last few years.

These issues are not listed in standard British catalogues, but some appear in certain specialised works. The following descriptions of the various islands give some indication of the extent to which these locals may be used. In accordance with G.P.O. regulations, local issues are placed on the backs of the envelopes. [*Id.* at 129 (emphasis supplied).]

From the foregoing authorities it is clear that private local stamps issued for the purpose of transporting mail by private carrier from an offshore island to the mainland of the United Kingdom cannot be designated postage stamps, absent a consent or authorization by an existent government.

However, the plaintiff through its witness, L. N. Williams, urges that in the instant action an established "need" for the transportation of mail from the island of Staffa serves to cause the Staffa stamps to assume the identity of postage stamps. Except for the plaintiff's foregoing assertion, the court finds no authority supportive of this contention. In the philatelic world the determination of an established "need" for the transportation of mail is a criterion

---

7. Local stamps have been included in a separate and individual publication known as *Scott's United States Stamp Catalogue Specialized* (1976). Plaintiff's Exhibit 22.

8. Defendant's Exhibit EE, at 103.

9. *Id.*

10. Plaintiff's Exhibit 20.

relating to the validity of and the justification for the issuance of private local stamps only.

Although unnecessary for a determination of the issue presently under consideration, it is deemed helpful in assessing the weight to be given to the testimony of the respective witnesses to examine the nature of the "need" which the plaintiff contends through its witness, Williams, to exist for the transportation of mail, a total distance of 7.8 miles, from the uninhabited island of Staffa to the Scottish mainland. In the opinion of the court this "need" in actuality is rather a promotional merchandising plan wherein an attractive and novel souvenir is sold to a tourist which may be retained by the buyer in such form or affixed to a letter or card and carried back by the ferry company, transporting the tourists, to an official mail depository on the mainland where appropriate charges are paid and British postage stamps affixed for transmittal of the letter or card under the postal laws of the United Kingdom. Any "need" created is only incidental to and in furtherance of the primary purpose, i. e., the sale of a 23K gold souvenir.

It would appear that the witness, Williams, has not at all times voiced the opinion concerning which he testified in the trial of this action. In a publication designated *Cinderella Stamps* authored by the witness—L. N. Williams, and his brother, M. Williams, relating to bogus or phantom issues, a severe indictment is directed to the offering of souvenir labels, similar in form to the merchandise in issue, as postage stamps.[11] The conclusions therein drawn by the witness best can be expressed in the article which bears his name:

> The 1960s saw the appearance of several sets of phantoms which we unhesitatingly condemned at the time and we repeat the warning here. The promoters of these labels attempted to foist them on to the collecting public as stamps for local postal services. Had it not been for the popularity of Cinderella material generally and local stamps in particular, it is cer-

tain that these so-called "stamps" would never have appeared on the market.

*Jethou.* An early offender was the occupier of Jethou, one of the smaller Channel Islands. According to our information from a reliable source Jethou labels are *not* local postage stamps, despite implications to the contrary published no doubt by interested parties. The total population of Jethou is four, of whom two are the occupier and his wife! Obviously there can be no possible need of a local postal service, certainly not at the time of year when there are no tourists. Yet despite this fact the Jethou labels have been overprinted "Europa 1961" and offered as local postage stamps. The only use for such an issue would be by the occupier on his own (or his wife's) mail, for which he must charge himself a fee, an obviously farcical state of affairs.

> In the summer there is a certain amount of tourist traffic to the island, but as one could walk round it in little more than an hour nobody would want to stay long enough to engage in correspondence except possibly to hand in a souvenir postcard. However, it was far easier and quicker to post such a card on nearby Guernsey, to which mail must, in any case, be sent. So there was no need at all for any issue of postage stamps on Jethou, *and the unoverprinted labels must be regarded simply as souvenirs, not local stamps. At best they were a bogus issue, on a par with the phantoms of the South Moluccas, Free Rumania, the Indonesian Repubic, and similar items.* [*Id.* at 99 (emphasis supplied in. part).]

Nor is the opinion voiced by the witness, Williams, at the trial of the within action shared by his colleagues in the philatelic world. The Cinderella Stamp Club is an association of amateur and professional philatelists who are primarily interested in local stamps, bogus and phantom issues, Christmas seals and other miscellaneous labels. As editors, the witness, L. N. Williams, and his brother, M. Williams, publish-

11. Defendant's Exhibit W.

ed for the Cinderella Stamp Club a journal entitled *The Cinderella Philatelist.* Contained in an issue thereof under date of April 1975 is an article by a contributor relating to "British Off-Shore Island Postal Services." [12] In addressing the question as to when a need might exist justifying a "local post" and the issuance of stamps, the author states:

> But assuming that any local post is legal, which set of circumstances justifies the issue of stamps? The island must have a population, and by population I mean people that live on the island year in year out. Uninhabited islands cannot, by any stretch of the imagination, be regarded as having a need for a local post. It has often been stated that certain islands, mentioned in these notes, have many summer visitors; most, if not all, are one-day visitors only. One-day visitors, no matter how many, do not constitute a need for a postal service. Any visitor who does "post" a letter or postcard is only taking advantage of the postal facility, and had this facility not been available he would not even have thought of sending any letter. [*Id.* at 31.]

The article continues by examining approximately 22 islands offshore of the United Kingdom with respect to size, habitants, relationship to the mainland, need for postal service and the evaluation of the type of stamp issued in connection with each respective island. Specific reference therein to the island of Staffa and the Staffa stamps bears the following evaluation:

> As this is an uninhabited island no postal need exists *Conclusion*: Stamps are labels only. [*Id.* at 57.]

 From all of the evidence submitted, including the testimony of the highly qualified witnesses presented by the government, the court makes the following findings with respect to the issues presented in connection with the plaintiff's claimed classification of the subject merchandise under item 274.40, TSUS:

(1) that the common meaning of postage stamps as used in item 274.40, TSUS,

is a label issued by a government which may be affixed to mail evidencing prepayment of charges for the transmission thereof through its postal service.

(2) that the Staffa stamps, the merchandise in issue, have not been issued by any government or by the specific authority thereof, and, accordingly are not postage stamps within the purview of item 274.40, TSUS.

(3) that the philatelic meaning of the term "postage stamps" is synonymous with the common meaning and usage of that term determined by this court.

(4) that the Staffa stamps under philatelic meaning and usage are characterized within the general classification of Cinderella stamps, which bear a meaning different and distinct from the term "postage stamps."

## II

Plaintiff's alternative claims of items 274.70 and 274.90, TSUS, are classified under part 5 of schedule 2 entitled: "BOOKS, PAMPHLETS, AND OTHER PRINTED AND MANUSCRIPT MATERIAL." Headnote 1 of part 5 provides:

*Part 5 headnotes*:

1. Except for decalcomanias, labels, flaps, and bands, all of which are covered by the provisions therefor in this part, regardless of the nature of the printing thereon, this part covers only printed matter consisting essentially of textual and pictorial matter produced by any printing process, and similar matter in manuscript or typewritten form. The text may be set forth in any language by means of any kind of characters. With the exceptions above indicated this part does not cover any article in which printing is merely incidental to the primary use of the article or in which printing is employed mainly for coloration or to produce a decorative or novelty effect (see part 4 of this schedule).

12. Defendant's Exhibit X.

It is not in dispute that the raised design on the merchandise in question is produced by an embossing process. In seeking a determination of plaintiff's claimed classification by the court, the parties present a single question of law, to wit—Is embossing a "printing process" whose product can be "printed matter" within the purview of part 5 of schedule 2, TSUS.

Extended testimony has been introduced by the plaintiff and the defendant in their respective efforts to establish the meaning of the term "printing." The meaning of this term, as contended by the plaintiff, is best characterized by one of its witnesses who testified that in the printing trade, the term "printing" is understood to mean "the transference of, or the duplication of an image on a material." With respect to the term "printing process," the witness testified that the term means "many of various processes that will transfer or reproduce an image on a material." [13]

The defendant, on the other hand, contends that the term "printing" bears a more restrictive and definitive meaning in that ink is a necessary ingredient in the "printing process" and refers to the transfer of an ink or an inklike substance from a plate or other image carrier to a substrate. In support thereof the defendant refers to the elements of the "printing process" enumerated in the book, *The Printing Industry* (1967) by Victor Strauss:

> All printing production entails a combination of four elements: (1) a printing-image carrier, (2) paper or another printing stock, (3) printing ink, and (4) a printing press. Each of these four elements contributes in some measure to the appearance of printed images. [*Id.* at 12.]

However, it is not the function of the court to determine in this proceeding the meaning of the term ."printing" in the printing trade, but rather, to discern the Congressional intent with respect to its meaning as used in the enactment of the tariff schedules. *United States v. S. H. Kress & Co.*, 46 CCPA 135, C.A.D. 716 (1959). In the *Tariff Classification Study*

*Submitting Report* (November 15, 1960), it is acknowledged that "[t]he 'Brussels Nomenclature' and the 'Standard Industrial Classification Manual' exerted the greatest influence on the arrangement of the proposed revised schedules." *Id.* at 8. Reference to the *Explanatory Notes to the Brussels Nomenclature* as a source of legislative history with respect to the classifications included within part 5 of schedule 2, TSUS, is appropriate. Particularly is this true in view of the close similarity between the arrangement of the provisions in the two respective schedules. *United States v. Abbey Rents*, 66 CCPA ——, C.A.D. 1213, 585 F.2d 501 (1978).

Chapter 49 of the *Brussels Nomenclature* is entitled "PRINTED BOOKS, NEWSPAPERS, PICTURES AND OTHER PRODUCTS OF THE PRINTING INDUSTRY; MANUSCRIPTS, TYPESCRIPTS AND PLANS." A close similarity exists between the headnotes to schedule 2, part 5, TSUS, and the *Explanatory Notes* for Chapter 49 of the *Brussels Nomenclature* providing in pertinent part:

> With the few exceptions referred to below, *this Chapter covers all printed matter of which the essential nature and use is determined by the fact of its being printed with characters or pictorial matter.*
>
> On the other hand, paper, paperboard or cellulose wadding, or *articles* thereof, *in which the printing is merely incidental to their primary use * * * fall within Chapter 48*, and printed textile *articles * * * in which the printing is mainly for decorative or novelty purposes and does not affect the essential character of the goods, fall within Chapter 61.*
>
> For the purpose of this Chapter, the term "printed" includes not only reproduction by the several methods of ordinary hand and mechanical printing (lithography, offset printing, heliography, photogravure, etc.), but also by engraving, reproduction by duplicating machines, *embossing*, photography, etc., irre-

13. Plaintiff's witness Stanchfield. R. 268.

spective of the form of the characters in which the printing is executed (e. g., letters of any alphabet, figures, shorthand signs, Morse or other code symbols, Braille characters, musical notations, pictures and diagrams). *The term does not, however, include, coloration, decorative or repetitive-design printing.* [Emphasis supplied; emphasis in original omitted.]

There is also a close similarity between many of the items classified under schedule 2, part 5, TSUS, and the items classified under Chapter 49 of the *Brussels Nomenclature.* Particularly relevant is heading 49.11 of the latter schedule providing:

49.11 Other printed matter, including printed pictures and photographs.

In items 274.50–.70, schedule 2, part 5, TSUS, it will be noted that Congress likewise has included "photographs." With reference thereto, headnote 2(d) of part 5 of schedule 2 provides in pertinent part:

*Part 5 headnotes* :

\* \* \* \* \* \*

2. For the purposes of this part—

\* \* \* \* \* \*

(d) the term *"photographs"* embraces only pictures other than motion pictures, produced on photosensitive materials, and includes positive and negative images on exposed, or exposed and developed, photographic film. [Emphasis in original.]

When photographic film is exposed to light, the exposure produces an *invisible* change in the layer or coating (emulsion) on the photographic film, called the latent image, which does not become visible until the film is developed. *See 10 McGraw-Hill Encyclopedia of Science and Technology*, at 175–76. Inasmuch as the invisible image on exposed, but not yet developed, photographic film is classified under part 5 of schedule 2 of TSUS, it must be presumed that the Congress intended such photographic film to be considered therein as "printed matter

\* \* \* produced by any printing process." [14] A similar presumption must be made with respect to item 274.45, TSUS, under part 5 of schedule 2, providing:

274.45 X–ray film exposed, whether or not developed . . . . To accept defendant's argument that "printed matter" under part 5 must b̀e produced by a process which transfers ink from an image carrier (e. g., a plate or type) to a substrate, producing a visible image, would be to contravene the clear intent of Congress. The defendant further contends that inasmuch as the terms "embossed" and "printed" are referred to separately, in several provisions in part 4 of schedule 2, TSUS, the Congress, by so doing, has recognized that "embossed" articles are not "printed." Accordingly, it is contended that in part 5 of schedule 2, the term "printed" should exclude the term "embossed."

The presumption that Congress intends a word or a phrase used in different parts of the tariff schedules to bear the same meaning throughout the schedules is applicable *only* in the absence of any clear indication of a contrary intent.[15] In headnote 1 of part 5, "printing," as employed to produce textual and pictorial matter, is specifically distinguished from "printing," as employed for coloration or a decorative effect, provided for in part 4 of schedule 2, TSUS. The intention of Congress not to attribute the same meaning to the word "printing" in all classifications in which the term is included was evidenced in the Tariff Act of 1930. Paragraphs 1409 and 1410 thereof would indicate that it has been the intention of Congress that the determination as to whether a product of a particular process constitutes "printing" depends upon the particular use to which the product is put. The court, therefore, concludes that Congress intended to include reproductive processes, other than those involving the

---

**14.** In a case decided under the Tariff Act of 1913, the Board of General Appraisers held that photographs were not "printed matter" as used in the Tariff Act, presumably because the photographic image is not produced by printing type or ink. *See Meadows, Wye & Co. v.*

*United States*, 38 Treas.Dec. 653, T.D. 38505 (1920).

**15.** *Productol Chemical Co. v. United States*, 74 Cust.Ct. 138, C.D. 4598 (1975).

**510**

transfer of an ink to a substrate by an image carrier, as "printing processes" producing "printed matter" classifiable under part 5 of schedule 2, TSUS. Among those reproductive processes is "embossing."

Notwithstanding that embossing may be "printed matter" within the purview of part 5 of schedule 2, the court is satisfied that this determination alone is not dispositive of the issue as to whether the embossed merchandise in the instant case can be classified under item 274.70 or 274.90, TSUS, as claimed by plaintiff. Headnote 1 of part 5 of schedule 2 provides in relevant part that with certain enumerated exceptions:

> * * * this part covers only printed matter consisting *essentially* of textual and pictorial matter produced by any printing process * * *. [Emphasis supplied.]

█ The tariff schedules do not define the term "essentially of." In construing this phrase, particularly in the context of headnote 1, the court again finds instructive the *Explanatory Notes* to Chapter 49 of the *Brussels Nomenclature* which provides in relevant part:

> With the few *exceptions* referred to below, this Chapter covers all printed matter of which the essential nature and use is determined by the fact of its being printed with characters or pictorial matter. [Emphasis in original.]

This court is in agreement with the foregoing and is of the opinion that for an article to be "printed matter" under part 5, the essential character of the article must be imparted by the textual and pictorial matter contained thereon. Neither a visual examination of the Staffa stamps nor the evidence submitted relating thereto permits such a conclusion.

█ The merchandise in question is solely distributed in the United States by Calhoun's Collectors Society, Inc. Calhoun's produced an advertising brochure concerning the Staffa Stamps.[16] At the top of the first inside page the brochure states, "See how surprisingly little it now costs to ac-

quire gold." On the same page it describes the merchandise as "[a] rare series of stamps for collectors and investors * * * minted from pure 23 KARAT GOLD." Later in the brochure the Staffa merchandise is described as:

> An unusually inexpensive and guaranteed loss-free way to invest in the great collectibles and gold boom.
>
> Precious metal has always been favored as a hedge against inflation. Especially when worked into items that have artistic value as well. A Picasso plate in sterling, for example, has double value. Its artistic value as a Picasso *and* its monetary value as silver.
>
> * * * * * *
>
> * * * [The Official-Seal Stamps] have exceptional collector's value because they are extraordinarily rare stamps—minted by hand in high relief, not merely printed. *And* they have definite monetary value as well, because they are made of *pure 23K gold instead of paper.* [Emphasis in original.]

The excerpts from the advertising brochure, which the court finds to be the only evidence offered pertinent to the inquiry concerning the essential character of the Staffa stamps, indicate to the court that the desirability of the merchandise is derived equally, if not principally, from the gold as a source of monetary value having an excellent investment potential and as a unique and novel substrate for the design thereon. It cannot be said that the essential character of the merchandise is imparted from the printed matter. *See Marshall Co. v. United States,* 67 Cust.Ct. 316, C.D. 4291, 334 F.Supp. 643 (1971). In viewing the evidence in its entirety, the court finds that the plaintiff has not provided the quantum of evidence sufficient to establish that the essential character of the merchandise in question is the printing thereon. In sum, the plaintiff has failed to rebut the presumption of correctness that "attaches not only to the ultimate conclusion of the Collector that the goods are properly classified

**16.** Defendant's Exhibit J.

in a particular category, but also to every subsidiary fact necessary to support that conclusion." *See United States v. New York Merchandise Co.*, 58 CCPA 53, 58, C.A.D. 1004, 435 F.2d 1315 (1970).

### III

Plaintiff further claims in the alternative that the merchandise in question should be classified under item 790.55, TSUS, which provides in pertinent part:

Sheets, strips, tapes, stencils, monograms, and other flat shapes or forms, all the foregoing articles (except articles provided for in item 790.50) which are pressure sensitive, with or without protective liners, and whether or not in rolls . . . . . . . . . . . . . . . . . . . . . . . . . * * *

In Schedule 7, part 13, subpart A, "pressure sensitive" is defined as:

*Subpart A headnotes* :
\* \* \* \* \* \*

2. The term *"pressure sensitive"*, as used in items 790.50 and 790.55, refers to articles which have an adhesive coating on one or both surfaces that will adhere to other surfaces upon the application of pressure only.[17]

Defendant contends that the articles are not "flat" within the meaning of subpart A. Inasmuch as Congress has not defined "flat" as used in 790.55, TSUS, the court again resorts to the use of standard lexicographic sources and other extrinsic aids. "Flat" is defined in *Webster's Third New International Dictionary* (1966) as:

1: having or marked by a continuous surface that is horizontal or nearly so without significant curvature or inclination and without *noteworthy* elevations

or depression * * * [Emphasis supplied.]

With respect to the above definition, the following exchange between defendant's counsel and plaintiff's witness, Blank, on cross-examination, proves informative:

Q. Would you have any idea approximately how high that image is raised?—A. My guess would be around two to three-thousandths of an inch. I could measure that but I don't have the instruments here.

Q. Considering the relative thinness of this stamp, would that be a considerable raised portion?—A. Yes. Possibly one-third of it, or something like that. [R. 245–46.]

In the production of the Staffa stamps the lettering and design thereon are created by raising a part of the substrate from the remaining portion thereof. The only evidence submitted relating to the contours of the surface of the subject merchandise is the above-quoted testimony—approximately the raised image to comprise about one-third of the stamp's total thickness. Such an elevation in the form of a raised design manufactured or produced upon a substrate, which in its original form possessed no elevations or depressions, indeed, must be deemed "noteworthy" when viewed in relation to the article of which it has become a part and is not incidental thereto.

█ It is the opinion of the court that the surface of the Staffa stamps is not flat within the intendment of part 13, subpart A of schedule 7.[18]

17. Plaintiff alleged in paragraph 14 of its Complaint that the Staffa articles were pressure sensitive. Defendant in paragraph 14 of its Answer responded to paragraph 14 of plaintiff's Complaint with "Denies." The defendant has admitted on page 70 of its Brief that the fact as to the merchandise being "pressure sensitive" is not in dispute. Therefore, the court concludes that the "pressure sensitive" characteristic of the merchandise was never in dispute and will be taken as established. An examination of the articles in question (plaintiff's exhibit 7) reveals that some of the articles have what appears to be an adhesive coating.

18. The *Explanatory Notes* to heading 48.05 of the *Brussels Nomenclature*, though perhaps not a source of legislative history for 790.55, TSUS, provides insight into the meaning of "flat" in reference to embossed articles:

48.05—PAPER AND PAPERBOARD, CORRUGATED (WITH OR WITHOUT FLAT SURFACE), CREPED, CRINKLED, EMBOSSED OR PERFORATED, IN ROLLS OR SHEETS.

This heading covers a variety of papers and paperboards in *rolls or sheets* having the common characteristic of having been *worked during or after manufacture in such a*

Accordingly, the subject merchandise cannot be classified under item 790.55, TSUS, as sought by plaintiff's alternative claim.

## IV

The evidence submitted by the plaintiff in support of its last claimed alternative classification, item 644.52, TSUS, at best, can be characterized as negligible. In attempting to meet its burden of proof, the plaintiff relies on representative samples of the merchandise in question (Plaintiff's Exhibit 7), and a single conclusional statement contained in the testimony of one of its witnesses.[19]

 It is well recognized that an exhibit said to be representative of the merchandise in question may be a potent witness. *Marshall Field & Co. v. United States*, 45 CCPA 72, C.A.D. 676 (1958). However, to present an exhibit to the court without submitting accompanying evidence, by testimony or otherwise, indicating wherein it conforms to the specifications commonly recognized to describe the article concerning which a classification is claimed, causes the exhibit to be of little value.

It is acknowledged without dispute that the substrate of the Staffa stamps consists of thin sheets of 23K gold. The only testimony, however, which serves to relate in any manner this merchandise to gold leaf is found in the answer to the question of plaintiff's counsel as to whether the witness would characterize the Staffa stamps as gold metal leaf, mounted. In answer thereto, the witness stated:

A. Yes. They could be classified as gold metal leaf mounted, because that, in effect, is what they are.[20]

This testimony in its most favorable light can be deemed little more than a conclusion of the witness and gives no assistance to the court in determining whether specifications

and characteristics of the gold substrate of the Staffa stamps fall within the meaning of gold leaf as contemplated by item 644.52, TSUS. As our appellate court has stated with respect to testimony of a similar nature in the case of *Keer, Maurer Company v. United States*, 46 CCPA 110, C.A.D. 710 (1959): "[W]e believe this testimony to be at most mere *declarations of an essential ultimate fact in issue*, without any corroborating evidence." *Id.* at 115. (Emphasis supplied.)

In the absence of any definitive meaning of the term "gold leaf" contained in the tariff schedules, the court again will turn to dictionaries and other recognized authoritative sources in order to determine the Congressional intent as to the meaning of that term. In *Webster's Third New International Dictionary* (1966), "gold leaf" is defined as:

A sheet of gold ordinarily varying from four to five millionths of an inch in thickness that is used esp. for gilding and lettering on glass.

The *Summaries of Trade and Tariff Information* (1968), schedule 6, volume 5 at 135, describes "metal leaf" and, in particular, "gold leaf":

Metal leaf is extremely thin metal usually made by beating thin metal sheets, first between sheets of parchment, then between sheets of animal membrane (goldbeater's skin) or, more commonly now, between sheets of thin, tough plastic. Gold leaf (items 644.46–.52), the thinnest metal leaf, is between three- and four-millionths of an inch thick. Mounted gold leaf is leaf that has a backing of tissue paper adhering to it for ease in handling * * *.

 The court is satisfied that the term "gold leaf" possesses a meaning more specific and definitive than the description—a "thin" or "very thin" sheet of gold metal, as

*way that they are no longer flat or of uniform surface. It includes:*

\* \* \* \* \* \*

(3) * * * *Embossed* papers and boards are those on which a perceptible unevenness of surface has been obtained * * * by

pressing it with engraved or embossed metal plates. * * * [Emphasis supplied.]

19. Plaintiff's witness, Blank.

20. R. 232.

the merchandise in question is generally referred to throughout plaintiff's testimony. The foregoing definitions indicate that to constitute an article denominated "gold leaf," it must qualify in particular with respect to a specific specification, i. e., the thickness thereof must be within three- to five-millionths of an inch.

█ As to what thickness the Staffa stamps comprising exhibit 7 may be, the evidence is silent. Accordingly, this fact remains undetermined. A visual examination of the exhibit by the court cannot and does not serve as a substitute for the establishment by the evidence of the specific linear measurement recognized to be determinative of an article known as "gold leaf." Indeed, it might well be that evidence could have been brought before this court sufficient to establish the Staffa stamps should be classified as gold leaf, mounted, under the provisions of item 644.52, TSUS. Suffice it to say, it is the conclusion of the court that the plaintiff has failed to sustain its dual burden of proof as to this claimed alternative classification.

█ For the reasons hereinbefore discussed in connection with its determination of the successive claimed alternative classifications, it is the opinion of the court that the plaintiff has failed to overcome the presumption of correctness attaching to the classification of the subject merchandise by the customs officials.

Let judgment be entered accordingly.