GUARDIAN INDUSTRIES CORPORATION, PLAINTIFF *v.* UNITED STATES, DEFENDANT

Consolidated Court No. 78–5–00895

Before MALETZ, *Judge.*

(Decided January 5, 1982)

*Barnes, Richardson & Colburn* (*Rufus E. Jarman, Jr.* and *Jacqueline Nolan-Haley* at the trial and on the briefs) for the plaintiff.

*J. Paul McGrath,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Madeline B. Kuflik* at the trial and on the brief), for the defendant.

MALETZ, *Judge:* The importations in this case consist of flat pieces of tempered glass which are used in sliding glass patio doors. The glass pieces were produced in annealed form in the United States, sent to Canada for a heat treatment known as tempering and then returned to the United States. Upon their return in 1977 and 1978, they were classified by the government as tempered glass under item 544.31 of the Tariff Schedules of the United States (TSUS), and assessed duty of 11 percent ad valorem.[1] Plaintiff claims that the tempering process is an alteration and that the imported merchandise should therefore be given the benefit of item 806.20, TSUS, which provides for articles returned to the United States after having been exported for repairs or alterations.[2] Thus plaintiff claims that the duty of 11 percent should

---

[1] Schedule 5, Part 3, Subpart B, item 544.31, TSUS, reads as follows:

544.31     Toughened (specially tempered) glass, made of any of the glass described
in items 541.11 through 544.18, whether or not shaped or framed or both_    11% ad val.

[2] The relevant portions of Schedule 8, Part I, Subpart B of the TSUS pertaining to item 806.20 read as follows:

Subpart B—Articles Advanced or Improved Abroad

*Subpart B headnotes:*

\*     \*     \*     \*     \*     \*     \*

2. *Articles repaired, altered, processed, or otherwise changed in condition abroad.*—The following provisions apply only to items 806.20 and 806.30:

(a) The value of repairs, alterations, processing, or other change in condition outside the United States shall be—

(i) the cost to the importer of such change; or
(ii) if no charge is made, the value of such change,

\*     \*     \*     \*     \*     \*     \*

Articles returned to the United States after having been
exported to be advanced in value or improved in con-
dition by any process of manufacture or other means:

806.20       Articles exported for repairs or alterations_____    A duty upon the value of the repairs or alterations (see headnote 2 of this subpart).

have been assessed only upon the value of the alleged alterations performed in Canada. The issue then is whether, as plaintiff contends, the tempering operation performed upon the articles in Canada is an "alteration" within the meaning of item 806.20 or, as the government contends, a processing operation creating a new and distinct article so as to foreclose item 806.20 eligibility.

## THE FACTS

The facts, as established at trial, are as follows: The imported articles, as noted before, consist of flat pieces of tempered glass. They are known as "lites";[3] come in standard sizes measuring either 34''×76''×⅛'' or 28''×76''×⅛''; and are used in sliding glass patio doors. The pieces were made in Carleton, Michigan from annealed lites of glass which were pre-cut to standard patio door shapes and exported by plaintiff to its plant in Tillsonburg, Canada. In Canada the annealed lites were tempered and then imported into the United States in 1977 and 1978.

All the imported glass lites were intended by plaintiff to be used in this country for sliding glass patio doors. In that connection, 16 C.F.R. § 1201—a regulation issued by the Consumer Products Safety Commission that became effective on July 6, 1977—required glass used for such doors to be tempered or subjected to another safety process as a prerequisite to its being marketed in the United States.[4] However, even prior to that regulation, it was already the practice of plaintiff and other glass manufacturers to temper all glass which was intended to be used in sliding glass patio doors.

Tempered glass has different characteristics than annealed glass. The purpose of subjecting glass to an annealing operation is to reduce the internal stresses in the glass and to acheive uniformity of stresses throughout the glass. Such stress reduction and uniformity are necessary to ensure that the annealed glass can be cut into desired sizes or shapes or further fabricated. The needed reduction and uniformity are accomplished during the annealing process in which the glass is cooled slowly, gradually and evenly under controlled conditions. Because the rate of cooling is slow, the center of the glass is closer in temperature to the outside "skin" of the glass resulting in less compression and tension in the glass itself.

The purpose of tempering, on the other hand, is to create or increase stresses and tensions within the glass and is thus the direct opposite of the annealing process. Whereas annealing involves *gradual*

---

[3] The term "lite" signifies a flat piece of glass and thus the merchandise in issue is referred to as "tempered lites" while the merchandise from which the tempered lites are made is referred to as "annealed lites."
[4] This regulation reflected the existing requirement of some 30 States. Its purpose was to reduce the chance of injury and the severity of injury that might be incurred by a person impacting with the glass.

cooling of the glass, tempering is accomplished by heating the glass to approximately 1200° Fahrenheit and then *rapidly* cooling the surface.[5] In the tempering process, the outside of the glass cools faster than the inside and this differential cooling rate ultimately results in a difference in the stresses in the core of the glass and those on the outside surface or "skin" of the glass. By rapid cooling, the surface of the glass is locked into a state of high compression and the inside central portion or core is locked in compensating tension. These stresses or strains created by the differential cooling of the surfaces and core of the glass give the glass significant added strength to the extent that the tempered glass has three to four times more resistance to impact than annealed glass. Thus, while the annealed glass can withstand approximately 7,000 pounds of pressure per square inch, the imported tempered glass can withstand approximately 22,000 pounds of pressure per square inch. In addition, tempering changes the fracture characteristics of the glass upon breakage. Accordingly, while annealed glass will break into large irregular pieces with sharp jagged ends, tempered glass will shatter into many small and relatively harmless slivers, pieces or cubes, hence making it much safer to use.

There are other differences between annealed and tempered glass. For example, annealed glass can be cut, drilled, ground and seamed, whereas tempered glass cannot be subject to those operations. In addition, tempered glass is more resistant to sudden temperature change than annealed glass and has more than twice its thermal shock resistance. Further, although tempered and annealed glass appear the same to the naked eye, their appearance when viewed under polarized light differs since tempered glass will show strong color patterns which represent the stresses induced during the tempering process.

There is also a difference in trade nomenclature between annealed and tempered glass. Annealed glass is known in the trade as "float glass," whereas tempered glass is referred to as "tempered glass" or "safety glass." Plaintiff has given the tempered glass involved here the trade name "Safeglaze," but has no trade name for the annealed glass.

OPINION

The scope of the term "alterations," as used in item 806.20 has recently been considered by the Court of Customs and Patent Appeals in *Dolliff & Company, Inc.* v. *United States*, 66 CCPA 77, C.A.D.

---

[5] In plaintiff's tempering operation, the annealed glass is also seamed and etched. Seaming consists of removing the sharp edges from the glass and thereby reduces the danger of a person being cut. A logo is etched into one corner of the glass to distinguish the tempered glass from annealed glass and to indicate compliance with the safety standards.

1225, 599 F. 2d 1015 (1979). In *Dolliff* certain greige goods were exported to Canada where they were subjected to a number of operations, consisting of heat-setting, chemical scouring, dyeing and heat-setting a second time. The resulting merchandise was finished fabric suitable for manufacture into curtains. The court noted the following distinction between "repairs," "alterations," and "processing" (66 CCPA at 82, 599 F. 2d at 1019):

> * * * [R]epairs and alterations are made to completed articles and do not include intermediate processing operations which are performed as a matter of course in the preparation or manufacture of finished articles.

Given that distinction, the court held that the operations performed upon the greige goods were processing operations and not alterations since the greige goods were not completed articles, but rather required further processing in order to be suitable for use in the manufacture of curtains.

Applying the *Dolliff* criteria to this case, it is concluded that the exported articles of raw annealed glass were not "completed articles" since they were entirely unsuitable for their intended use in the United States as sliding glass patio doors. Thus, while annealed glass may be used for a variety of purposes (such as for table tops, non-safety doors and windows), to be used as patio doors in the United States the glass had to undergo tempering or other safety processing. This has been required by federal regulation since July 6, 1977 in order to reduce "[l]acerations, contusions, abrasions and other injury or death resulting from walking or running into * * * sliding glass doors." 16 C.F.R. § 1201.1(d)(1)(i).[6] Moreover, the testimony at trial established that the tempering of glass for use in patio doors was the standard practice of plaintiff and others in the glass industry even before the issuance of the federal regulation. Thus, the record shows that the tempering process is performed "as a matter of course" upon all glass which is to be used in the United States in its finished state as sliding glass patio doors.

In addition to *Dolliff*, another case which illustrates the difference between "alterations" and manufacturing processes performed upon articles which are incomplete for their intended use is *United States* v. *J. D. Richardson Company*, 36 CCPA 15, C.A.D. 390 (1948), *cert. denied*, 336 U.S. 936 (1949).[7] In *Richardson* certain "rims" were

---

[6] The regulation is a consumer product safety standard which was promulgated by the Consumer Products Safety Commission pursuant to the authority granted to it by 15 U.S.C. § 2056. It therefore has the force and effect of law. E.g., *Gallagher & Ascher* v. *United States*, 14 Ct. Cust. Appls. 38 at 42, T.D. 41548 (1926) and cases cited.

[7] *Richardson* was cited with approval in *Dolliff*, 66 CCPA at 82-83, 599 F.2d at 1019-20.

exported to Canada to be flanged. The purpose of the flanging was stated by the court as follows (36 CCPA at 16):

> * * * (I)t was necessary, for their practical use and to conform to the specifications of the Ordnance Department of the United States Army, that the rims contain flanges *to strengthen them* and that they could not be used in their condition as exported for the purposes hereinbefore stated. [Emphasis added.]

The court then held that the flanging was not a mere alteration for the following reasons (36 CCPA at 17):

> It clearly appears from the record that the articles exported to Canada were not parts of machines but were manufactures of metal. It is true that they had been so processed as to be dedicated to the use of making rims for the T–26 tank. However, they were not completed parts but, on the contrary, *required the manufacturing processes* hereinbefore referred to *in order to complete them as "flanged" rims for their intended use.* [Emphasis added.]

The facts in *Richardson* are very similar to those here since the glass must be tempered (i.e., strengthened) for practical safety use reasons and to conform with federal regulation. And as in *Richardson*, the merchandise here in its condition as exported (annealed glass) could not be used in the United States for its intended purpose in sliding glass patio doors. It thus follows from *Richardson* and *Dolliff* that when, as here, the exported article is incomplete for its intended use and therefore requires a manufacturing process to make it complete, that process is not an alteration.

Plaintiff argues, however, that the tariff meaning of the term "alterations" cannot be affected by the promulgation of a safety regulation. It is quite true that the definition of a term contained in a statute or regulation dealing with nontariff matters does not determine the common meaning of that term for tariff purposes. E.g., *International Spring Mfg. Co.* v. *United States*, 85 Cust. Ct. 5 at 8, C.D. 4862, 496 F. Supp. 279 at 282 (1980), *aff'd*, 68 CCPA 13, C.A.D. 1257, 641 F. 2d 875 (1981). Given that circumstance, any definition of the Consumer Products Safety Commission would have little, if any, relevance to the common meaning of the term "alterations." Nonetheless, it is to be borne in mind that in the decisions of the Court of Customs and Patent Appeals in *Dolliff* and *Richardson* which construe the tariff provision for repairs and alterations performed abroad, the focus is upon whether the exported article is "incomplete" or "unsuitable for its intended use" prior to the foreign processing. Hence, in this case, the safety regulation in issue is relevant not for purpose of determining common meaning but to demonstrate the unsuitability of the annealed glass for use in sliding glass patio doors since it makes such use illegal.

Beyond these considerations, it is to be noted that for tariff purposes a process which converts one article into a new article is not an "alteration." *A. F. Burstrom* v. *United States*, 44 CCPA 27, C.A.D. 631 (1957); *C. J. Tower & Sons of Niagara, Inc.* v. *United States*, 45 Cust. Ct. 111, C.D. 2208 (1960). In *Burstrom*, steel ingots were exported into Canada and reimported after having been converted into steel slabs. The chemical composition of the steel had not changed in the course of the slabbing operations. The imported articles were known as ingots and the exported articles were known as slabs and they were bought and sold commercially as different products. Furthermore the court noted that the ingots and slabs were separately specified in paragraph 304 of the Tariff Act of 1930, as modified. The court concluded that slabs "are clearly not the same articles as ingots" (44 CCPA at 29) and the processing of the ingots into slabs was therefore held not to be an alteration within the purview of paragraph 1615(g) of the Tariff Act of 1930.[8] In short, *Burstrom* holds that when a foreign processing creates a new article of commerce, the processing is not an alteration.[9]

The record here leaves no doubt that the tempered glass produced in Canada is a separate and different commercial article from the annealed glass from which it was processed.[10] This is evident from the Tariff Schedules themselves where tempered glass and annealed glass are provided for in *separate* provisions.[11] Annealed glass (otherwise known as float glass) is classified under items 543.21 through 543.69 of the Tariff Schedules. Tempered glass is provided for in item 544.31 which covers:

> Toughened (specially tempered) glass *made of* any of the glass described in items 541.11 through 544.18, whether or not shaped or framed or both. [Emphasis added.]

This use of the phrase "made of" is of significance. The word "made" is defined in Webster's Third *New International Dictionary*, Unabridged (1968) at p. 1356 as: 1a. artificially produced by a manufacturing process.

---

[8] Paragraph 1615(g) is the predecessor of item 806.20, TSUS, and contains virtually the same language.

[9] The decision in *Burstrom* was cited by the Court of Customs and Patent Appeals with approval in *Dolliff*, 66 CCPA at 81, 83–84, 599 F. 2d at 1020.

[10] Plaintiff relies heavily on *C. S. Emery & Co.* v. *United States*, 71 Treas. Dec. 880, T.D. 49000 (1937). That case was discussed and distinguished as follows in *Burstrom* (44 CCPA at 30):

> The case [Emery] dealt with the question of the free entry from Canada of certain chuck bushings imported for the purpose of being chromium plated in the United States. It was uncontradicted that the identity of the bushings was not changed by the plating and that they were so marked in being cast that there would be no difficulty in identifying them on re-exportation. There is no similarity to the situation involved here. Bushings went out and bushings came back.

This distinction is equally applicable here since the annealed glass was changed through tempering into a new and different article.

[11] Congress is presumed to know the language of commerce and to have framed tariff acts so as to classify commodities according to the general usage and denomination of the trade. *Nylos Trading Company* v. *United States*, 37 CCPA 71 at 73, C.A.D. 422 (1949).

Thus, the tariff provision for tempered glass reflects the Congressional understanding that tempered glass is the *completed* article which was produced by a manufacturing process from the materials classified under items 541.11 through 544.68, TSUS. Contrariwise, had Congress considered tempering to be an alteration rather than a manufacturing process, then "it" would seem that the provision for tempered glass would have read "Toughened (specially tempered) glass *altered* from any of the glass described in items 541.11 through 544.18." [Emphasis added.]

Moreover, in *Richardson* the Court of Customs and Patent Appeals recognized that a foreign processing which results in a change in the tariff classification of the article after it has been processed may be considered to be more than an alteration since it creates a new article. In *Richardson*, the flanged rims which were imported *after* the foreign processing (flanging) were classifiable as "parts of machines" under paragraph 372 of the Tariff Act of 1930. The court stated (36 CCPA at 18):

> We are of the opinion * * * that it was not intended by the word "alterations," contained in paragraph 1615(g), *supra*, to permit articles, such as in the instant case, to be exported in an unfinished condition *which could not have been classified as parts of machines, and so manufactured abroad that upon their return would be properly dutiable as parts of machines.* Had the "unflanged" articles, exported to Canada, been imported into the United States in an "unflanged" condition, in view of the record in this case, they certainly could not have been classified as parts of machines under paragraph 372, *supra*.

The tempering process unquestionably changes the classification of the merchandise from float glass to tempered glass. And since the tempering created a new tariff article, *Richardson* impels the conclusion that such tempering is not within the intended scope of the term "alterations" as used in item 806.20.

Not only do the Tariff Schedules treat tempered glass and float glass as separate and distinct articles of commerce, plaintiff itself considers them in the same way since it provides for the two types of glass separately in its sales brochures.[12] Furthermore, the two products are known by different names. The glass before it is tempered is described as annealed glass and is known in the glass trade as "float glass." On the other hand, the tempered glass is known in the glass trade as "tempered glass" or "safety glass."

---

[12] The manner in which a product is advertised and marketed has often been considered by courts in determining its proper classification. E.g., *Schott Optical Glass, Inc.* v. *United States*, 82 Cust. Ct. 11 at 19, C.D. 4783, 468 F. Supp. 1318 at 1323 (1979), *aff'd*, 67 CCPA 32, C.A.D. 1239, 612 F. 2d 1283 (1979); *Norman G. Jensen, Inc. a/c Calhoun's Collectors Society, Inc.* v. *United States*, 84 Cust. Ct. 76 at 92-3, C.D. 4846, 490 F. Supp. 497 at 510 (1980), *aff'd*, 68 CCPA 5, C.A.D. 1255, 634 F. 2d 1345 (1980).

The record is replete with other proof that the exported articles of annealed glass were transformed by tempering into a new and different commercial article with different characteristics and uses. As stated before, the purpose of tempering is to create or increase stresses and tensions within the glass. By creating these stresses tempering changes two very important characteristics of annealed glass. First, it greatly increases its strength. Second, tempering changes the fracture characteristics. Annealed glass will break in large irregular pieces with sharp jagged ends, whereas tempered glass will shatter into many small and relatively harmless slivers, pieces or cubes, thus making it much safer to use. There are many other differences between tempered glass and annealed glass. For example, annealed glass can be cut, drilled, ground and seamed; tempered glass cannot be subject to those operations. Tempered glass is more resistant to sudden temperature change than annealed glass and has more than twice the thermal shock resistance of annealed glass. Tempered glass has a superior thermal endurance to annealed glass. When viewed under polarized light there is a difference in appearance between tempered and annealed glass.

What is more, plaintiff's own sales brochure shows that due to its characteristics float or annealed glass can be used in any type of building with many applications. In contrast, in the same brochure, plaintiff's tempered glass is recommended only for certain applications such as certain windows, enclosures and entrances where it is important to protect people against the hazards of normal glass breakage. Thus, the uses of the tempered glass are much more limited and specialized than the uses of float glass.

In sum, the tempering of the annealed glass transformed the glass in name, use, performance characteristics and tariff classification. Consideration of all of these factors leads to the conclusion that the tempering operation created a new and different commercial article. Accordingly, the tempering operation is not an "alteration" [13] within the meaning of item 806.20 and the action is hereby dismissed.

---

[13] Because of this conclusion, it is unnecessary to reach defendant's additional contention that the importations are not eligible for item 806.20 treatment on the asserted ground that plaintiff failed to comply with specified customs regulations.