**HOLLY STORES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 75–8–02104.**

United States Court of International Trade.

Dec. 21, 1981.

Sharretts, Paley, Carter & Blauvelt, New York City (Peter Jay Baskin, New York City, at the trial; Richard M. Belanger, New York City, with him on the brief), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C. (Joseph I. Liebman, Attorney in Charge, Commercial Litigation Branch, New York City (Sidney N. Weiss, New York City, at the trial and on the brief), for defendant.

LANDIS, Judge:

This action, tried before me in New York, involves the classification of two types of clothes hangers, an all plastic hanger referred to as a K–10 type hanger (plastic hanger), and a color coded hanger made of wire and covered with plastic (wire hanger).

Customs officials classified the hangers under TSUS items 382.78 and 382.81 as various articles of wearing apparel. Plaintiff claims that the hangers are imported articles and should be classified under TSUS item 774.60 as modified by T.D. 68–9, as articles of rubber or plastic not specially provided for and under TSUS item 658.00, as modified by T.D. 68–9, as articles of base metals and plastics.

The issue presented is whether the hangers are part of the value of the articles they hold thereby dutiable at the same ad valorem rate as are their contents or whether they are imported articles thereby classifiable as separate articles of commerce.

The pertinent tariff schedule provisions are as follows:

General Headnotes and Rules of Interpretation

\* \* \* \* \* \* \*

6. Containers or Holders for Imported Merchandise. For the purposes of the tariff schedules, containers or holders are subject to tariff treatment as follows:

\* \* \* \* \* \* \*

(b) Not Imported Empty: Containers or holders if imported containing or holding articles are subject to tariff treatment as follows:

(i) The usual or ordinary types of shipping or transportation containers or holders, if not designed for, or capable of, reuse, and containers of usual types ordinarily sold at retail with their contents, are not subject to treatment as imported articles. Their cost, however, is, under section 402 or section 402a of the tariff act, a part of the value of their contents and if their contents are subject to an ad valorem rate of duty such containers or holders are, in effect, dutiable at the same rate as their contents, except that their cost is deductible from dutiable value upon submission of satisfactory proof that they are products of the United States which are being returned without having been advanced in value or improved in condition by any means while abroad.

(ii) The usual or ordinary types of shipping or transportation containers or holders, if designed for, or capable of, reuse, are subject to treatment as imported articles separate and distinct from their contents. Such holders or containers are not part of the dutiable value of their contents and are separately subject to duty upon each and every importation into the customs territory of the United States unless within the scope of a provision specifically exempting them from duty.

(iii) In the absence of context which requires otherwise, all other containers or holders are subject to the same treatment as specified in (ii) above for usual or ordinary types of shipping or transportation containers or holders designed for, or capable of, reuse.

\* \* \* \* \* \* \*

Classified under:

SCHEDULE 3. – TEXTILE FIBERS AND TEXTILE PRODUCTS

\* \* \* \* \* \* \*

Part 6. – Wearing Apparel and Accessories

\* \* \* \* \* \* \*

Other women's, girls', or infants' wearing apparel, not ornamented:

\* \* \* \* \* \* \*

Of man-made fibers:

382.78     Knit ............25¢ per lb. + 32.5% ad val.

\* \* \* \* \* \* \*

382.81     Not knit .........25¢ per lb. + 27.5% ad val.

Claimed under:

SCHEDULE 6. – METALS AND METAL PRODUCTS

\* \* \* \* \* \* \*

Part 3. – Metal Products

\* \* \* \* \* \* \*

658.00   Articles of base metal not provided for in the foregoing provisions of this subpart, not coated or plated with precious metal ...................9% ad val. [as modified by T.D. 68/9]

\* \* \* \* \* \* \*

SCHEDULE 7. – SPECIFIED PRODUCTS, MISCELLANEOUS AND NONENUMERATED PRODUCTS

\* \* \* \* \* \* \*

Part 12. – Rubber and Plastics Products

\* \* \* \* \* \* \*

Articles not specially provided for, of rubber or plastics:

\* \* \* \* \* \* \*

774.60    Other ................8.5% ad val. [as modified by T.D. 68/9]

General Headnote 6(b) is the controlling statutory provision in this action. Examination of Headnote 6(b) indicates that the primary criteria in determining whether a container or holder type article is subject to treatment as an imported article is whether it is designed for or capable of reuse or is ordinarily sold at retail with its contents. Headnote 6(b)(i) is clear in its intention. If a holder or container is not designed for or capable of reuse or is of the usual type ordinarily sold at retail with its contents, then that holder or container is not subject to treatment as an imported article but

rather is treated as part of the value of its contents and subject to the same dutiable rate as its contents.

If designed for or capable of reuse, these containers or holders fall within the purview of Headnote 6(b)(ii) and are treated as separate and distinct imported articles and are subject to a rate of duty as if they had been imported without their contents.

If these containers or holders are not the usual or ordinary types of shipping or transportation containers or holders, then they are within the purview of Headnote 6(b)(iii) and are treated as imported articles subject to the same customs' duty effect as articles under 6(b)(ii).

It is against this background that the court must review the subject merchandise of this action.

The trial record consists of the testimony of four witnesses and eight exhibits. Three witnesses testified and seven exhibits were introduced on plaintiff's case and one witness testified and one exhibit was introduced on defendant's case.

Plaintiff's initial witness, Joseph N. Mecca, was at the time of trial manager of the K–Mart Apparel Corporation's Distribution Center in New Jersey, a position he had held for approximately four years.[1] Prior thereto, he held several other positions with K–Mart including manager of its hangwear division at the California Distribution Center. He was employed as a department manager for W. T. Grant Co. before his affiliation with K–Mart. As distribution center manager he supervised 731 employees and was responsible for the movement of approximately 200 million garments annually. He was also familiar with the "store level" operation of K–Mart.

The witness identified the first hanger presented to him as an all plastic hanger and denominated it a K–10 type hanger. This hanger type was introduced into evidence as Exhibit 1. He testified that it was used for hanging light-weight garments such as tops and blouses and that these type garments are imported on the K–10 hanger flat packed in cartons. He stated that after processing the merchandise through the distribution center it was sent to a specific K–Mart store and taken out of the carton and placed on a rack with the hanger. When a customer purchases the garment the hanger is removed and retained by the store for future use to hang additional merchandise that comes in or to return damaged or recalled merchandise to the distribution center. He also stated that when a new K–Mart store opens it receives a shipment of K–10 hangers directly from the hanger manufacturer.

Mr. Mecca identified the second hanger presented to him as a metal hanger covered with plastic. These hangers were introduced into evidence as Plaintiff's Collective Exhibit 2.

The witness testified that the exhibit 2 hanger (wire hanger) was a heavier type hanger than the exhibit 1 (K–10 type) hanger and was used to hang items such as blazers, heavy coats and suits. This type of merchandise arrives at the warehouse distribution center in special hanging containers or trailers, suspended therein on the hangers in issue. He further stated that the wire hangers are color coded to differentiate various sizes and that K–Mart will not accept hangwear garments not shipped on the color coded wire hangers. Once these wire hangers and garments arrive at the retail facility the wire hanger is removed and stored in a storeroom for use in returning damaged or recalled hangwear merchandise to the warehouse. At the retail level, the metal hangers are replaced by K–10 or other type plastic hangers. He also stated that the amount of all retail store returns to the warehouse was less than one percent of all goods shipped to the retail store.

Finally, the witness testified that both the K–10 plastic hanger and the wire type plastic-coated hanger are reused by K–Mart Corporation in the course of its commercial activities.

1. The witness stated that K–Mart Apparel Corporation has also been known by the name Holly Stores, the plaintiff herein, and that the predecessor of K–Mart was S. S. Kresge.

Plaintiff's next witness was Jeffrey Brody, president of Cardan Plastic Products Corp., a manufacturer of plastic shipping hangers. The record indicates that Mr. Brody has manufactured plastic hangers for eleven years and that he specifically manufactures the K–10 type plastic hanger for K–Mart. He stated that he was involved in the actual design of the K–10 hanger and that it was specifically designed for reuse by making it 25 to 30 percent heavier than the previous design of plastic hanger manufactured for K–Mart or for vendors to K–Mart. The witness further testified that the hangers were not manufactured to be sold as hangers by K–Mart or other stores and that direct sales to K–Mart (generally for use in its new store openings) represented a very small percentage of his business.

Plaintiff's final witness was Marjorie Alfus, an attorney, and at the time of trial, resident counsel for K–Mart Corp. Among her responsibilities was compliance with state and federal law relating to consumer product safety issues, licensee issues, contracts, and customs law issues. The foreign department and the quality control department were under her supervision. This witness testified that she had personal involvement with developing the use of the K–10 hanger and that said hanger was designed with the intention of it being reusable. This reuse included hanging merchandise that came into the retail store without hangers, to replace broken and nonconforming hangers, and to replace K–10 hangers that were given to the customer who purchased the garment and requested the hanger. She further testified that she had personally observed the reuse of both the K–10 and the wire hangers at the retail store level approximately fifty (50) times a year.

On cross-examination the witness stated that the primary function of the hanger is to put merchandise at a certain visibility for prospective customers by hanging garments in a neat and orderly fashion. The witness also stated that she estimated the cost of the K–10 hanger to be "considerably under a dollar" per dozen hangers and that the cost to the K–Mart operation of purchasing a garment with a hanger was less than

purchasing a garment and affixing a hanger at the retail store level.

Defendant's sole witness, Harry Lerner, was a manufacturer of ladies' sportswear and president of Connie Fashions, Inc. for twenty-one years. In addition to the aforementioned experience the witness stated he operates seven retail stores and that he had been employed by Oxford Industries for five years as a supervisor and a manufacturer of men's and ladies' apparel. Prior to employment at Oxford Industries, plaintiff had been self-employed for eight years under the name Taglee Company in New York City where he assembled and re-shipped ladies' blouses to manufacturers.

He stated that he is familiar with all aspects of the medium priced ladies' garment industry in the United States. He further testified that domestic stores will not accept ladies' pants suits if they are not shipped on a hanger because they would lose their shape and it would be too costly for retail stores to individually handle and rehang each garment.

According to Mr. Lerner he does not bill hangers as items separate from the garment it holds, and the rate of return of garments to a manufacturer because of noncompliance or damage is one to one and one-half percent. Upon being shown the plastic hanger (Exhibits 1 and 7) and the wire hanger (Exhibit No. 2), Mr. Lerner testified that he considers both to be disposable type hangers and that his stores throw them away as soon as possible to avoid storing them. The witness also stated that the plastic (K–10) hanger costs 3.8 cents each currently and about 2.75 to 3.0 cents each in 1974.

On cross-examination it was evident that the witness was unfamiliar with importing merchandise from overseas but that he did purchase merchandise from importers. Further, it was demonstrated that his manufacturing and retail activities were concentrated in the Southeast region of the United States. The witness stated that he re-used the plastic type hanger to replace broken hangers but that such reuse was

insignificant although it did occur regularly.

On redirect examination Mr. Lerner stated that the price of the plastic hanger is insignificant in relationship to the price of the hung garment and that the cost of the hanger is integrated into the cost of the garment.

In examining General Headnote 6(b) the court notes that it is essential to initially define the term "reuse" since that term appears and is of pivotal importance in the three subsections under 6(b).

■ It is fundamental in Customs Jurisprudence that tariff terms are to be construed in accordance with their common and commercial meanings, which are presumed to be the same. *United States v. C. J. Tower & Sons of Buffalo, N. Y.*, 48 CCPA 87, C.A.D. 770 (1961); *Merry Mary Fabrics, Inc. v. United States*, 1 CIT ——, Slip Op. 80–3 (November 18, 1980); *Norman G. Jensen, Inc., et al. v. United States*, 84 Cust.Ct. 76, C.D. 4846, 490 F.Supp. 497 (1980), aff'd, 68 CCPA ——, C.A.D. 1255, 634 F.2d 1345 (1980). In determining the common meaning of a term the court may, and often does, consult dictionaries, lexicons and other reliable sources of information. *Trans-Atlantic Company v. United States*, 60 CCPA 100, C.A.D. 1088, 471 F.2d 1397 (1973).

In the present action the parties do not disagree as to the standard definition of "reuse".[2] Rather, the controversy centers about the degree of the reuse and whether plaintiff's reuse of the hangers in issue is sufficient to be considered reuse in the commercial sense as contemplated by the statute.

■ The importation of merchandise in containers or holders and the subsequent reuse of the container or holder is a thorny problem often confronted by the courts both under the various tariff acts and the tariff schedules (TSUS). Under TSUS, the phrase "designed for, or capable of, reuse", as found in General Headnote 6(b), is used in the practical commercial sense of reuse for transportation purposes, and not for incidental or fugitive uses. *Fontana Hollywood Corp. v. United States*, 64 Cust.Ct. 204, C.D. 3981 (1970).[3] It appears that reuse under General Headnote 6(b) must be a reuse for a transportation or shipping purpose, and a reuse in the general course of standard acceptable commercial practice in the industry and a reuse in a manner consistent both as to substance and degree with the original use.

This clearly enunciated outgrowth of commercial reuse in the Tariff Schedules is based upon the development of the law under the tariff acts. The Court of Customs Appeals in *United States v. Hohner et al.*, 4 Ct.Cust.Appls. 122, 127–128, T.D. 33393 (1913) in interpreting and applying subsection 18 of section 28 of the Tariff Act of 1909 [4] set forth certain guidelines and criteria for use in determining whether a container or holder is separately dutiable from its contents. It stated:

But if it appears that they are unusual and designed for some substantial, material, or valuable use other than that of holding or containing the merchandise while being therein transported, they are

2. *Webster's Third New International Dictionary*, Unabridged (1966) defines "reuse": "To use again: to use (as a container) again or repeatedly."

3. This premise is succinctly stated in the comments on General Headnote 6 found in the Tariff Classification Study, Seventh Supplemental Report (August 14, 1963) at 99:

The phrase "designed for, or capable of, reuse" is used in a practical commercial sense. Capability is measured by commercial practices. The reuse contemplated is for commercial shipping or transportation purposes, and not incidental or fugitive uses.

4. 36 Stat. 11, 101 (1909). This section, an early forerunner to General Headnote 6(b) stated:

If there be used for covering or holding imported merchandise, * * * any unusual article or form designed for use otherwise than in the bona fide transportation of such merchandise to the United States, additional duty shall be levied and collected upon such material or article at the rate to which the same would be subjected if separately imported. * * *

then subject to the additional duty. The transportation referred to in the section may include placing the same in the hands of the retailer, or in some cases in the hands of the consumer, and an incidental use of the covering or container, if one exists, may be enjoyed by the retailer in selling the particular merchandise so transported. The value of the alleged unusual container or covering, as compared with that of its contents, may be important in determining whether it is or is not separately dutiable. If it appears that after its use as a holder or container of the merchandise imported therein it becomes a subject of trade and commerce here, or if it is generally devoted to other uses, its adaptability to which are an important inducement to the consumer to purchase the same with its contents, or if it is sold with its contents and materially enhances the value thereof to the consumer, any such facts may warrant its separate duty assessment under the section. * * *

■ Thus, the courts at an early date recognized that a container or holder of merchandise that was designed for *"some substantial, material or valuable use"* (emphasis supplied) other than holding the merchandise during transportation [5] would be subject to an additional duty separate from the merchandise they held. In deciding whether to assess the additional (separate) duty the court held that it could properly take into account the value of the container compared to its contents; whether it is generally devoted to other uses which induces the consumer to purchase its contents or enhances the value to the consumer; and whether it becomes a subject of trade and commerce in this country.

The aforementioned reasoning was later sanctioned by the Court of Customs and Patent Appeals in interpreting section 504 of the Tariff Act of 1930.[6] Thus, in *United States v. W. J. Mulligan & Co.,* 29 CCPA 117, C.A.D. 179 (1941), the appellate court cited verbatim from *United States v. Hohner et al.,* 4 Ct.Cust.Appls. at 127 and 128[7], thereby reaffirming its guidelines and criteria to determine whether a container or holder is separately dutiable from its contents.

The covering and holding provision under section 504 of the Tariff Act of 1930 remained substantially unchanged until the passage of the Tariff Classification Act of 1962 under which the Tariff Schedules, and more particularly General Headnote 6(b), became law.[8] Headnote 6(b) is more definitive in its approach to levying duties on holders or containers than was section 504

5. Transportation includes placing the merchandise "in the hands of the retailer, or in some cases in the hands of the consumer, and an incidental use of the covering or container, if one exists, may be enjoyed by the retailer in selling the particular merchandise so transported". *United States v. Hohner et al., supra,* at 128.

See also, *United States v. Thurber,* 28 F. 56, where the jury instruction under a case involving section 7 of the Tariff Act of 1883 stated at 59:

In the expression "designed for use otherwise than in the *bona fide* transportation of goods to the United States," I shall hold, for the purposes of this case, that the word "transportation" includes the transporting or carrying of the goods within this country to the hands of the consumer, so long as the boxes remain and are transported unbroken; and that the transportation referred to does not stop at the doors of the custom-house, but includes the transportation to the vest pocket, if you please, of the consumer. On any other construction, the real purpose of section 7 would, I think, be thwarted.

6. 46 Stat. 732, 19 U.S.C. § 1504.

SEC. 504. COVERINGS AND CONTAINERS.

If there shall be used for covering or holding imported merchandise, whether dutiable or free of duty, any unusual material, article, or form designed for use otherwise than in the bona fide transportation of such merchandise to the United States, additional duties shall be levied upon such material article, or form at the rate or rates to which the same would be subjected.

This section represents the most recent forerunner to General Headnote 6(b)(iii).

7. This verbatim citation is quoted earlier in this opinion under the discussion of the Tariff Act of 1909, 36 Stat. 11, 101 (1909).

8. 76 Stat. 72, eff. August 21, 1963, 77 Stat. 1017.

of the Tariff Act of 1930 and subsection 18 of section 28 of the Tariff Act of 1909. However, the basic intent is preserved. The previous statutes held that the container or holder is separately dutiable where the combined elements existed that the container was unusual and was of use otherwise than in the import transportation of its contained or held merchandise. In essence, these statutes stated that the container must be unusual in a substantially different way from its initial primary purpose, the transportation of its contents to the United States.

General Headnote 6(b) states the same intent with a slightly different twist designed to centralize the container and holder provisions of tariff law. 6(b)(iii) is the embodiment of section 504.[9] This subsection, as its predecessor, requires that the container be unusual. However, 6(b) makes a further distinction with a basic intent similar to section 402(b) of the Tariff Act of 1930, as amended.[10] It distinguishes between a holder or container that is usual and not reusable (6(b)(i)) and a usual holder or container that is reusable (6(b)(ii)). Section 402(b) provided that duty on the container would be the same as its contents in all cases except where the container was unusual, in which case it would be *separably* dutiable under section 504. No mention of use or reuse appeared in section 402(b). The concept of reuse, however, was important in determining whether a container or holder was unusual. Thus, if a container or holder was subject to a reuse other than for which it was originally intended and induced the consumer to purchase, then by operation of law it was taken out of the ambit of section 402(b) and deemed an unusual container under section 504. In other words, the concept of reuse in the prior statutes was of determinative importance in deciding whether the container or holder was unusual which, in turn, determined whether the container or holder was

*separably* dutiable. *R. J. Saunders & Co., Inc. v. United States*, 69 Cust.Ct. 151, C.D. 4387 (1972). In *R. J. Saunders & Co., Inc., id.*, the court once again used the criteria set forth under *United States v. Hohner et al., supra*, and *United States v. W. J. Mulligan & Co., supra*, to determine the dutiability of a container. More importantly, the *Saunders* court used this criteria in interpretation of section 402(b) which is the forerunner of General Headnote 6(b)(i).

■ With the *Saunders* decision the court has run the full circuit. It has used the criteria developed in *Hohner, supra*, to interpret both section 504 and section 402(b), the predecessors of General Headnotes 6(b)(iii) and 6(b)(i) which basically determines whether a container or holder is *separably* dutiable from its contents. In view of this fact and the reality that the term "reuse" is used in each subsection of General Headnote 6(b) without distinction, and since there appears to be no distinction between the generic term "use" (reuse) of 6(b) and the term "use" under the former statutes, I believe it to be perfectly proper to utilize case law evolved under the former tariff acts to interpret the term "reuse" as presently embodied in General Headnote 6(b).

■ Focusing initially on the K–10 type plastic hanger, I find that this hanger is not designed for, or capable of, reuse in the commercial sense and that Customs' finding that it is dutiable as part of its contents (clothing) is correct.

Plaintiff's reuse of the K–10 hanger is not the commercial reuse contemplated under General Headnote 6(b). The reuse demonstrated by plaintiff is a severely limited reuse which has not been a demonstrated reuse to any significant commercial degree throughout the industry by other purchasers of the plastic hanger or competitors of K–Mart. The reuse demonstrated is strictly limited to the operation of K–Mart's own

**9.** *The Spesco Corporation v. United States*, 62 Cust.Ct. 297, C.D. 3749 (1969).

**10.** Customs Simplification Act of 1956, 70 Stat. 943.

This section, in pertinent part, states that the cost of "all containers and coverings of whatever nature" shall be added to the export value of imported merchandise.

enterprise and then, at best, the reuse is shown only to be incidental and fugitive relative to K–Mart's own scale of operations. The testimony of the two K–Mart employee witnesses indicates that the lighter flat packed hangwear that is imported and arrives at the K–Mart distribution center and is subsequently shipped to retail stores is imported with the hanger holding the particular garment. Witness Mecca testified that ninety-five (95) percent of all garments sent from the warehouse to the retail store had hangers accompanying them and the remaining five (5) percent of the shipped garments were of the type that would be displayed for sale on tables i.e. tablewear and not hangwear. Witness Mecca also testified that garments shipped without hangers are unacceptable unless properly folded because the garments would crease or wrinkle.[11]

According to witnesses Mecca and Alfus the plastic hangers perform a valuable function by hanging their contents uniformly for display to potential customers at the retail level. Witness Alfus testified that this was the primary purpose of the K–10 hangers. However, this function of the hanger is part of the general transportation purpose of the hanger which may include placing the merchandise in the hands of the consumer notwithstanding any incidental use or benefit enjoyed by the retailer in selling the particular merchandise so transported. The direct function of the hanger is to transport garments which includes hanging garments for sale to consumers. The fact that the hangers are the same size, color, shape, etc. and give a uniform appearance on display is incidental to their direct function. See generally, *United States v. Hohner et al., supra*, at 128; *United States v. Thurber, supra*, at 59.[12]

Witness Brody's testimony that the K–10 hanger was designed for reuse is entitled to great weight since he helped design it and was the manufacturer of that hanger. However, the concept of reuse contemplated by Mr. Brody and the concept of reuse contemplated under General Headnote 6(b) are not equivalent. Mr. Brody testified that the K–10 hanger was made approximately 25 to 30 percent heavier by weight with a larger hook and thicker walls giving it greater strength in order to prevent the large amount of crackage of previously shipped plastic hangers and to create a uniform supply and recycling program for the K–Mart system. Mr. Brody defined reuse as the ability to use the hanger to hang another garment without reference to commercial degree of reuse or possible reuse for another purpose by the consumer. The witness stated that his sales of the K–10 hanger directly to K–Mart represented a very small percentage of his business and that the hanger was not intended to be resold to the consumer public.

In examining the K–10 hanger in light of the commercial reuse contemplated by statute it is evident that said hanger does not meet the criteria of commercial reuse set forth in the *Hohner, W. J. Mulligan,* and *R. J. Saunders* cases, *supra*. In the first place, the hanger itself does not enter the mainstream of commerce nor does it become a separate item of commerce. Plaintiff's own witnesses testified that the hanger is seldom given to the purchaser of its contents except upon specific request and was not intended to be resold to the public. It gives no inducement to the consumer to purchase the hung merchandise and does not materially enhance the value of the merchandise to the consumer. It's cost, under four (.04) cents each, is negligible in comparison to

**11.** There is a conflict between plaintiff's witnesses Mecca and Alfus as to the condition of garments received if not shipped with hangers. Defendant's witness Lerner testified as did plaintiff's witness Mecca that the garments shipped without a hanger would be wrinkled, lose their shape, and not be suitable for sale. Witness Alfus testified to the contrary. In view of the fact that witnesses Mecca and Lerner have a much more in-depth technical background than witness Alfus, an attorney, the court finds that a preponderance of the evidence indicates that the hangers perform a positive function during the actual transportation of merchandise by preventing creasing and wrinkling and maintaining saleability without special folding or handling.

**12.** Pertinent language in these two opinions cited verbatim in footnote 5 of this opinion.

the cost of the merchandise it holds. It has no ulterior purpose or use other than to hang merchandise to prevent creasing and wrinkling during shipment and for presentation to perspective consumers, all of which is part of its transportation function. Defendant's witness Lerner stated that this particular plastic hanger is referred to as a disposable hanger in the industry and his retail stores discard most of them after the initial use to avoid storing them.

It is evident that witness Brody contemplated a reuse of the plastic hanger only in the limited sense that K-Mart would internally reuse it without reference to reuse in the commercial sense. Mr. Brody never intended that the original manufacturer or shipper of clothes would reuse the hanger nor that the retail consumer would reuse the hanger.

The evidence presented further indicates that K-Mart's own reuse is incidental and thus, under this criteria in determining whether an article is separately dutiable, falls short of commercial reuse under the statute. On plaintiff's direct case there was testimony to the effect that K–10 hangers are re-used to return damaged or recalled merchandise to the distribution center. Upon cross-examination it was estimated that under one (1) percent of the total merchandise shipped to the retail store is returned to the distribution center. Thus, the K–10 hanger and color-coded wire hanger *combined* are re-used well under one percent for return purposes relative to initial retail shipment.

There was further testimony to the effect that the K–10 hanger was re-used to replace K–10 hangers broken in shipment. No figures were given for this reuse, but it should be apparent small reuse in view of the fact that the K–10 hanger was specifically designed to be stronger to prevent crackage in shipment as indicated by witness Brody's testimony.

Another reuse of the K–10 hanger was to hang merchandise that came into the retail store without a hanger. But plaintiff's own witness Mecca testified that ninety-five (95) percent of the merchandise shipped to the retail stores are on hangers and further,

that the remaining five (5) percent are tablewear items not meant to be hung. Again, the reuse here would appear to be under one (1) percent.

Finally, the K–10 hanger is used to rehang heavier garments that originally arrive on wire color-coded hangers. No figures were given for this particular reuse. Although the court believes this reuse to be more substantial than the other reuses, it cannot anticipate that such reuse would be of such magnitude relative to K-Mart's entire hangwear operation that it would indicate that the K–10 is reusable in the commercial sense. Moreover, the court cannot speculate since it is incumbent upon plaintiff to prove his case demonstrating the correctness of his claimed classification and the error of the government's classification. *Ideal Musical Merchandise Co. v. United States*, 84 Cust.Ct. 56, C.D. 4843 (1980).

In examining the evidence presented of the reuse of the wire hanger (exhibit 2) it is at once evident that this type hanger does not meet the statutory definition of reuse in General Headnote 6(b). The testimony of plaintiff's two employee witnesses indicates that these hangers enter the country holding garments and continue to so hold these garments in the distribution center and in shipment to the retail store. At the retail store they are removed and stored for reuse to reship damaged and recalled merchandise. As indicated in discussion of the K–10 hanger, less than one (1) percent of the garments shipped to retail stores are returned on either K–10 or wire hangers. The wire hanger is not given to the consumer nor resold commercially. It is not reused in K-Mart's enterprise or otherwise except to return merchandise. Such reuse, at best is extremely incidental and fugitive and not within the commercial meaning of reuse. *Fontana Hollywood Corp. v. United States, supra.*

In conclusion, plaintiff has failed to demonstrate that its reuse of the plastic and wire hangers is reuse within the commercial meaning of General Headnote 6(b). The evidence of record indicates that the reuse here falls neither within the classical approach to reuse which generally takes into account the value of the holder or contain-

er, its adaptability for reuse other than as a holder or container and the impact of these factors upon the consumer's propensity to purchase the contents thereof; nor reuse to a commercially significant degree that is neither incidental nor fugitive to the standard acceptable commercial practice. Plaintiff has not rebutted the presumption of correctness which favors Customs' classifications, *J. E. Bernard Co. v. United States*, 81 Cust.Ct. 60, C.D. 4766 (1978), and has not sustained its dual burden of proving the government's classification erroneous and its own claimed classification correct. *Hawaiian Motor Company v. United States*, 82 Cust.Ct. 70, C.D. 4790, 473 F.Supp. 787 (1979), aff'd 67 CCPA ——, C.A.D. 1241, 617 F.2d 286 (1980).

In view of this holding it is unnecessary for this Court to rule upon defendant's additional contentions which are similarly not supported by the evidence.

Accordingly, the classification of Customs at the Port of New York is sustained and plaintiff's complaint is dismissed. Judgment shall enter accordingly.