**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Hemant PATEL, Raoji Patel, Bridgewater Development Co., and Pacific Food Beverages, Inc., Defendants-Appellants.**

**Nos. 84–1143 and 84–1146 to 84–1148.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1984.

Decided June 6, 1985.

As Amended June 28, 1985.

---

* The Honorable John W. Peck of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Peter Robinson, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Marcus S. Topel and William M. Goodman, Topel and Goodman, San Francisco, Cal., for defendants-appellants.

Before WRIGHT, PREGERSON and POOLE, Circuit Judges.

POOLE, Circuit Judge:

On November 9, 1983, appellants Hemant Patel, Raoji Patel, Bridgewater Development Company, and Pacific Food and Beverages were charged in a three-count indictment by the Federal Grand Jury in San Francisco. All appellants were charged in Count One with conspiracy to defraud the United States under 18 U.S.C. § 371 [1] by failing to comply with the International Coffee Agreement of 1962, 14 U.S.T. 1911, T.I.A.S. No. 5505,[2] and in

---

1. Section 371, Conspiracy to Commit Offense or to Defraud United States provides:

 If two or more persons conspire either to commit any offense against the United States or to defraud the United States, or any agency thereof * * * each shall be * * * [punished].

2. Although the indictment charged defendants with importing coffee in violation of the International Coffee Agreement of 1962, the version of the treaty in effect at the time of defendants' action was the International Coffee Agreement of 1976, 28 U.S.T. 6401, T.I.A.S. No. 8683, as extended by T.I.A.S. 10439 (Sept. 25, 1981). In

Count Two with importation of coffee contrary to the provisions of that agreement, hence violating 18 U.S.C. § 545, the smuggling statute.[3] Appellants Raoji Patel and Bridgewater Development Company were charged in Count Three with false statements in violation of 18 U.S.C. § 1001.[4] Count Three was dismissed upon motion of the government.

The appellants pleaded not guilty to all charges. Venue was ordered changed to Guam on December 19, 1983. On March 21, 1984, a jury found appellants guilty of Counts One and Two.

Motions for judgment of acquittal or for new trial were denied. On May 14, 1984, Hemant Patel was sentenced to one year in prison and a $10,000 fine on Count One, to five years probation and a consecutive $10,000 fine on Count Two, and was ordered to pay the costs of prosecution in the amount of $8,920.00. Raoji Patel was placed on five years probation and fined $20,000. The corporate defendants were each fined $20,000.

Appellants filed timely notices of appeal and we assumed jurisdiction under 28 U.S.C. § 1291. The cases were consolidated on appeal. We affirm.

## I. FACTS

The importation of coffee into the United States is governed by the International Coffee Agreement (ICA), which Congress has implemented in 19 U.S.C. § 1356a.[5] Administration of the ICA is the responsibility of the International Coffee Organization (ICO), headquartered in London. The agreement regulates both the import and export coffee trade of all signatories to the document. The goals of the ICA are generally the achievement of a reasonable balance between world coffee supply and de-

all essential respects, it is the same as the 1962 Agreement. The current version is the International Coffee Agreement of 1983, Senate Treaty Doc. No. 98–2, 98th Cong., 1st Sess. (March 23, 1983).

3. Section 545, Smuggling Goods into the United States, provides:

Whoever knowingly and willfully, with intent to defraud the United States, smuggles or clandestinely introduces into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

Shall be fined not more than $10,000 or imprisoned not more than five years, or both. Proof of defendant's possession of such goods, unless explained to the satisfaction of the jury, shall be deemed evidence sufficient to authorize conviction for violation of this section.

Merchandise introduced into the United States in violation of this section, or the value thereof, to be recovered from any person described in the first or second paragraph of this section, shall be forfeited to the United States.

The term "United States," as used in this section, shall not include the Philippine Islands, Virgin Islands, American Samoa, Wake Island, Midway Islands, Kingman Reef, Johnston Island or Guam.

4. Section 1001, Statements or Entries Generally, provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years or both.

5. The International Coffee Agreement Act of 1965, Pub.L. 89–23, § 2, May 22, 1965, 79 Stat. 112, enacted 19 U.S.C. §§ 1356a–1356e, providing for implementation of the United States' obligations under the International Coffee Agreement of 1962. For legislative history and purpose of subsequent enactments, see Pub.L. 90–634, 1968 U.S.Code Cong. & Admin.News, p. 4529; Pub.L. 91–694, 1970 U.S.Code Cong. & Admin.News, p. 6125; Pub.L. 92–262, 1972 U.S. Code Cong. & Admin.News, p. 2187; Pub.L. 96–599, 1980 U.S.Code Cong. & Admin.News, p. 7209; Pub.L. 97–446, 1982 U.S.Code Cong. & Admin.News, p. 4078; Pub.L. 98–120, 1983 U.S. Code Cong. & Admin.News, p. 1250.

mand; avoidance of excessive fluxuations in the levels of world coffee supplies, stocks, and prices; development of coffee producing nations; promotion of coffee consumption; and furtherance of international cooperation in connection with world coffee problems.[6] Quotas are established to limit the amount of coffee sold for export to the United States and other member countries of the ICO. Coffee sold for export to nonmember countries is unlimited, but sells at a lower price than coffee exported to member countries. Guam is a nonmember country.

In July 1982, Hemant Patel approached Joseph McDonald, the Director of the Department of Commerce for the Territory of Guam, with a proposal to ship raw coffee beans to Guam for transshipment to the United States. Patel provided details concerning his processing plans and represented to the Guam government his intention to conduct an extensive coffee bean processing operation through February 1983.

Joseph McDonald advised the appellants that under Headnote 3(a) of 19 U.S.C. § 1202 of the United States Tariff Schedules, the coffee could enter the United States as a product of Guam if the beans were processed on Guam. As a product of Guam, the coffee would then be exempted from tariffs and duties, and other United States trade restrictions, since Guam is an "insular possession" of the United States whose goods qualify for the Headnote exemption.

On or about December 23, 1982, Hemant Patel purchased approximately 3,000 metric tons of processed coffee beans from Honduras and shipped them to Guam, allegedly for processing. Patel falsely represented to the Honduran coffee seller that the coffee was destined for Hong Kong, which, like Guam, is a nonmember country of the ICO. Patel was therefore able to purchase the coffee at $54 per bag instead of $120 per bag, which would have been the price had the coffee been billed for ship-

ment to an ICO member country. A Certificate of Origin was forwarded to the ICO indicating that the shipment was destined for Hong Kong.

When the Honduran coffee arrived in Guam, Anil Patel explained to customs officials that the discrepancy between the country of origin noted on the ship manifest (Hong Kong) and the port clearance documents (Honduras) arose because a third buyer at sea had diverted the ship to Guam. Anil Patel also told the customs officials that the beans were being graded on Guam, and that the coffee had been inspected by Malaysian surveyors in Honduras. Neither statement was true.

Once in Guam, the coffee was off-loaded, tagged with a card reading "Processed in Guam, USA" and loaded onto a ship headed for the United States. By that time, Joseph McDonald was no longer employed by the government and had been retained by appellants as a consultant. In February 1983, McDonald obtained a Certificate of Origin from the Guam Customs Department for the Honduran coffee, which already was in transit to the United States. The Certificate of Origin identified the shipment as processed agricultural beans, rather than coffee.

When the coffee reached the United States, the Food and Drug Administration insisted that the Patels identify the bean by its Latin name before the product could be released. In response, Raoji Patel informed his import broker that the Latin name was "coffea." This information was conveyed to the U.S. Customs Service, which then seized the coffee in March 1983. Proceedings were instituted to forfeit the illegally imported coffee and for civil penalities totaling $9,302,682.20.

## II. DISCUSSION

Appellants raise three main arguments for reversal: insufficiency of the evidence to support the convictions, reversible error

---

6. *See* Objectives, International Coffee Agreement of 1976, signed February 27, 1976; *see also* 1980 U.S.Code Cong. & Admin.News, p. 7209.

in jury instructions, and prosecutorial misconduct during closing argument. Additionally, appellants challenge the propriety of the trial court's assessment against Hemant Patel of the costs of transferring the case to Guam. We find no merit in any of the arguments for reversal nor any abuse of discretion in assessing costs.

## A. *Sufficiency of the Evidence*

Appellants claim that the government failed to prove that the quotas imposed by the International Coffee Agreement were in effect at the time the coffee was imported into the United States. Consequently, they contend that the evidence was insufficient to support their convictions because proof of the existence of quotas was required for them to be found guilty of importing coffee contrary to law under 18 U.S.C. § 545, and for conspiracy to defraud the United States under section 371.

■ The trial court instructed the jury that, in order to find the defendants guilty under those counts, the government had to prove beyond a reasonable doubt that "... the International Coffee Agreement and its quotas at all times relevant herein were operative and in effect." We believe that the district court, by its denial of the Rule 29 motions, and the jury, by its verdicts of guilty, necessarily found that the evidence showed the existence of ICA quotas when the coffee reached the United States. Even though the government had the burden of proof on this issue, *see In Re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), evidence was introduced at trial that would support a logical inference that quotas were operative.[7]

The jury verdict stands unless, viewing the evidence in the light most favorable to the government, no rational jury could have found beyond a reasonable doubt that the ICA quotas were in effect. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979) (question on review for substantial evidence is whether the record supports finding of guilt beyond a reasonable doubt); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) (same); *United States v. Abushi*, 682 F.2d 1289, 1293 (9th Cir. 1982) (same). On this record, a rational jury could have concluded beyond a reasonable doubt that all essential elements of the crimes charged were proven.

## B. *Claimed Errors in Jury Instructions*

■ Appellants assert five claims of error regarding the instructions given by the trial court. First, they contend that the instruction concerning the requirements of the ICA shifted to appellants the burden of proof. The challenged instruction (hereinafter referred to as the "unlawful importation instruction") states:

> Accordingly, the only law which you must consider in determining whether the coffee was lawfully imported into the United States is the ICA.

> \* \* \* \* \* \*

> The ICA allows coffee to be lawfully imported into the United States as follows:

> If you find that the coffee is a product of Honduras, an exporting member of the ICA,

> (1) the coffee shipment must be accompanied by an International Coffee Organization Certificate of Origin Form O and export stamps which certify that the coffee may be exported under Honduras' coffee export quota.

> If you find that the coffee is a product of Guam, a non-member of the ICA,

> (1) the coffee shipment must be entered into the United States under the import quota which applies to coffee imported from non-member countries.

It is well settled that jury instructions are to be viewed as a whole. *United*

---

7. Since the United States was a signatory to the agreement, the court could well have taken judicial notice of the existence of ICA quotas. Nonetheless, since the court did not take such notice, and did instruct the jury of its duty to find the fact, we examine and conclude that the fact was established.

States v. Park, 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975); *United States v. Marabelles*, 724 F.2d 1374, 1382 (9th Cir.1984); *Abushi*, 682 F.2d at 1299. Moreover, the adequacy of any challenge to an instruction must be evaluated in the context of the entire trial. *United States v. James*, 576 F.2d 223, 227 (9th Cir.1978). Substantial latitude is accorded the trial judge in tailoring instructions as long as they fairly and adequately cover the issues presented. *Marabelles*, 724 F.2d at 1382–83; *James*, 576 F.2d at 226.

Challenged error in the language of the trial judge's jury instructions will justify reversal only if abuse of discretion is shown. *James*, 576 F.2d at 227; *see Park*, 421 U.S. at 675, 95 S.Ct. at 1913; *Abushi*, 682 F.2d at 1299. Jury instructions on the burden of proof must not be so vague or ambiguous as to permit the jury to apply the wrong standard. *Notaro v. United States*, 363 F.2d 169, 175 (9th Cir. 1966). Instructions in a criminal case must be unmistakably clear, *id.*, however neither party may insist upon any particular language. *James*, 576 F.2d at 226.

In the present case, it was the government's burden to prove beyond a reasonable doubt that appellants' importation of coffee into the United States was contrary to 18 U.S.C. § 545. *See Olais-Castro v. United States*, 416 F.2d 1155, 1158 (9th Cir.1969) (essential elements of a section 545 violation are: "(1) defendant fraudulently or knowingly, (2) imported or brought into the United States, (3) any merchandise, (4) contrary to law."). We find that the jury instructions as whole, and particularly Instruction # 33, which contains the language specifically challenged, consistently and correctly allocated the burden of proof to the government. The language in controversy merely elaborates on Element Two of the three elements which the jury was told must be proved beyond a reasonable doubt before appellants could be convicted on Count Two. Element Two required the jury to find that "the defendants unlawfully imported coffee into the United States on or about the date specified in the indictment." The challenged language simply defined "unlawful importation" for the jury under the provisions of the ICA.

Second, appellants contend that the court abused its discretion by improperly instructing the jury that Headnote 3(a) of the Revised Tariff Schedules, 19 U.S.C. § 1202, did not apply to appellants' importation of coffee. Headnote 3(a) states in pertinent part:

> 3. *Rates of Duty*—The rates of duty ... apply to articles imported into the customs territory of the United States as hereinafter provided * * *;
>
> (a) Products of insular possessions:
>
> (i) * * * articles, imported from insular possessions of the United States which are outside the customs territory of the United States are subject to the rates of duty * * * except that all such articles the growth or product of any such possession, or manufactured or produced in any such possession from materials the growth, product, or manufacture of any such possession or of the customs territory of the United States, or of both, which do not contain foreign materials to the value of more than 50 percent of their total value * * are exempt from duty.

In essence, Headnote 3(a) provides that articles normally subject to ordinary duty rates, but which are imported into the United States from insular possessions of the United States, may enter the country duty-free if the articles do not contain foreign materials amounting to more than 50% of their total value. Appellants argue first, that their imported coffee should be characterized as a product of Guam under Headnote 3(a) processing standards.[8] Furthermore, appellants assert that Headnote

---

8. Appellants contend that sufficient processing occurred on Guam to account for over 50% of the value of the coffee that they imported into the United States. The coffee, therefore, should be considered a product of Guam, rather than Honduras, pursuant to the Headnote 3(a) processing standards.

3(a) not only exempts the coffee from tariffs and duties, but also from the quota restrictions imposed on non-ICO member countries under Article 45 of the ICA. This argument is based upon appellants' characterization of Headnote 3(a) as a "prior conflicting bilateral obligation" which, pursuant to ICA Article 45(4), preempts the quota provisions. Article 45(4) provides that:

> The obligations established in the preceding paragraphs of [Article 45] shall not derogate from any conflicting bilateral or multilateral obligations which importing Members have entered into with non-member countries prior to the entry into force of this Agreement * * *.

International Coffee Agreement of 1976, chap. VII, art. 45(4), 28 U.S.T. 6401, T.I.A.S. No. 8683 at 44.

The district court ruled against appellants regarding the effect of Headnote 3(a) on ICA quotas. The court concluded that Headnote 3(a) "is not relevant to the issue of whether the importation of coffee by the defendants into the United States was in fact lawful. Headnote 3(a) applies only to tariffs and duties, not quotas." Consequently, the court declined to treat the Headnote as a conflicting bilateral obligation that would preempt the Article 45 import limitations. Thus, even if the coffee could be characterized as a product of Guam, rather than Honduras, the quota provisions governing imports from non-ICO member countries still applied, and appellants were required to comply with those quotas under the ICA.

■ Appellants challenge the district court's ruling as to Headnote 3(a). On appeal we will review the interpretation of a statute *de novo*. *United States v. Wilson*, 720 F.2d 608, 609 n. 2 (9th Cir.1983) (Speedy Trial Act), *cert. denied,* — U.S. ——, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984); *United States v. Moreno-Pulido*, 695 F.2d 1141, 1143 (9th Cir.1983) (18 U.S.C. § 1426(b)).

■ In construing the Tariff Schedules, all parts of the statute must be read together and all relevant Headnotes considered to determine congressional intent. *Philipp Overseas, Inc. v. United States*, 496 F.Supp. 273, 276 (Cust.Ct.1980), *aff'd,* 651 F.2d 747, 68 CCPA 43 (1981). The meaning of tariff terms is presumptively the common meaning understood in trade and commerce. *Schott Optical Glass, Inc. v. United States*, 612 F.2d 1283, 1285, 67 CCPA 32 (1980). What constitutes the common meaning of a tariff term is a question of law. *Id.* In determining the common meaning of tariff terms, the court may consult dictionaries, scientific authorities, and other reliable sources of information. *Id.; Holly Stores, Inc. v. United States*, 2 C.I.T. 278, 534 F.Supp. 818, 823 (1981), *aff'd,* 697 F.2d 1387 (Fed.Cir.1982); *ITT Thompson Industries, Inc. v. United States*, 3 C.I.T. 36, 537 F.Supp. 1272, 1280 (1982), *aff'd,* 703 F.2d 585 (Fed.Cir.1982). The district court, therefore, appropriately referred to the dictionary meanings of "quota" and "duty" in determining the scope of Headnote 3(a).

■ We agree with the district court that Headnote 3(a) applies solely to tariffs and duties. Like the district court, we observe that the language of Headnote 3(a) makes no mention of quotas, but speaks only in terms of rates of duty for articles imported into the United States from insular possessions. Reading 19 U.S.C. § 1202 as a whole, we can find absolutely no references to quotas in any part of the statute, including the headnotes and the rules of interpretation.

Moreover, after examining the common meanings of the words "duty" and "quota," we conclude that "duty" cannot be read to encompass "quota," and therefore, that appellants' broad interpretation of the language of section 1202 is not justified. The word "duty" is commonly defined as "a tax imposed by law on the import or export of goods."[9] "Quota," on the other hand, is defined as "the share or proportional part of a total which is required

---

**9.** *The Random House College Dictionary* 411 (Revised ed. 1980).

from, or is due or belongs to, a particular district, state, person, group, etc." [10] It is clear to us that the words "duty" and "quota" are not synonymous. Nor have we found any indication that Congress intended a meaning different from that revealed by the plain language of section 1202. Consequently, we hold that Headnote 3(a) does not apply to quotas, and therefore, that it did not preempt the quota restrictions that were imposed on the coffee imported by appellants.

Third, appellants argue that the district court abused its discretion in defining a "product of Guam." They contend that the court should have instructed the jury that, under Headnote 3(a), the Honduran coffee could have been Guam coffee with sufficient processing in Guam. Instead, the instruction stated:

> For merchandise to qualify in Guam for a Certificate of Origin, which certifies that the merchandise is a product of Guam, the said merchandise must be manufactured in Guam from materials grown, produced or manufactured in Guam.

The trial court thus rejected the Headnote 3(a) "value added" formula which defines a product of Guam as one that does not contain foreign materials worth over 50 percent of the value of the product. In effect, the court's instruction precluded the jury from finding that the Patels' coffee was a product of Guam because it was processed from foreign (Honduran) raw materials.

Appellants argue that their defense theory [11] was based upon the use of the Headnote formula, and that the testimony at trial indicated that the Headnote definition was used by the government of Guam in determining when to issue a Certificate of Origin. Consequently, they urge that the Headnote definition should have been given, despite the fact that the district court determined that Headnote 3(a) was inapplicable to the quota restrictions at issue. This failure to properly instruct the jury allegedly denied appellants' right to present their theory of the case.

■ We find that because the district court correctly ruled that Headnote 3(a) is inapplicable, an instruction on the Headnote definition of a "product of Guam" was not required. The district court considered the Headnote in formulating its definition, but decided to give an instruction which it concluded was "in accord with prior formulations of [the product of Guam] concept as applied to United States customs laws, *see, Anheuser-Busch Brewing Ass'n. v. United States*, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336 (1908), and as defined by Guam authorities."

In *Anheuser-Busch*, the Supreme Court held that there must be some transformation so that a new and different article emerges having a distinctive name, character and use in order for a manufacturer to be entitled to drawbacks under section 25 of the Tariff Act of October 1, 1890. 207 U.S. at 562, 28 S.Ct. at 206. Merely subjecting imported articles, such as corks, to a cleansing and coating process that adapts them to a special use does not amount to manufacturing them within the meaning of the statute. *Id.* at 559 n. 1, 28 S.Ct. at 205 n. 1.

■ Pursuant to the Supreme Court's discussion of manufacturing in *Anheuser-Busch*, we cannot find error in the district court's decision to withhold giving the Headnote definition of a "product of Guam." An alternative instruction, discussing the requisite degree of change for a foreign product to become a product of Guam, would have been sufficient. The instruction that was given by the district court, however, apparently precluded foreign products from becoming products of Guam unless they had previously been manufactured in Guam and then were manufactured a second time. We disagree with

---

**10.** *Id.* at 1086.

**11.** The defense theory was that the importation was not unlawful because appellants properly qualified the coffee as a product of Guam, and therefore, Headnote 3(a) exempted the coffee from any ICA quota.

this part of the instruction since, with sufficient transformation as discussed in *Anheuser-Busch*, a foreign product could become a product of Guam through an initial manufacturing process.

That error, however, was harmless. Fed.R.Crim.P. 52(a). Quota restrictions were imposed under the ICA on coffee imported from both ICO member (Honduras) and nonmember (Guam) countries. Therefore, regardless whether the coffee was characterized as being from Honduras or from Guam, it was required to have been accompanied by the appropriate member or nonmember documents and requests. Instead, the coffee entered the United States falsely identified as processed agricultural beans and without complying with either ICA member or nonmember importation restrictions. It therefore could not legally have been a product of Guam through a new manufacturing process.

Fourth, appellants argue that, as the result of the unlawful importation instruction, they were tried and convicted for acts not charged in the indictment. The unlawful importation instruction discussed the requirements of coffee importation from both Honduras and Guam. Appellants contend that because the indictment only charged them with unlawfully importing *Honduran* coffee, the court improperly instructed the jury on the import requirements for coffee from Guam, and thus permitted them to be convicted unconstitutionally on the basis that the latter requirements were not satisfied.

A conviction generally must be reversed if the jury was permitted to convict the defendant on a theory not presented to the grand jury or contained in the indictment. *See United States v. Miller*, —— U.S. ——, ——, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (U.S. Apr. 2, 1985). This, however, is not such a case. Count I of the indictment enumerated as an Overt Act the shipment of coffee exported from Honduras to Guam and then on to the United States. Regardless whether the coffee eventually was determined to be from Hon-

duras or from Guam, that Count of the indictment clearly referred to the same shipment of coffee that was the subject of the unlawful importation instruction. Moreover, although Count II described the Patels' coffee as "Honduran Coffee," that description obviously was referring to the same shipment detailed in Count I. The appellants consequently were convicted for the very acts charged against them.

Fifth, appellants claim that their right to a unanimous jury verdict as guaranteed by the Sixth Amendment and Article III, section 2 of the United States Constitution was abridged because the trial court failed to instruct the jury to determine unanimously whether the coffee was a product of Guam or a product of Honduras. Without such an instruction, appellants argue that the jurors could have found the importation unlawful, but for different reasons, since the importation requirements depended upon whether the coffee was considered a product of Honduras, or a product of Guam.

Appellants rely on *United States v. Mastelotto*, 717 F.2d 1238 (9th Cir.1983), which held that in a prosecution for mail and wire fraud, defendant's right to a unanimous jury verdict is infringed when the court fails to instruct the jurors that they must all agree on the existence of, and defendant's participation in, the same scheme to defraud. In *Mastelotto*, the defendants claimed that a variance occurred between the single scheme charged in each count of the indictment and the proof at trial. *Id.* at 1247. The panel in *Mastelotto* reversed the conviction because it found that the jury instructions failed to require each juror to agree on the same single scheme to defraud as that charged in the indictment. *Id.* at 1250–51.

Similarly, in *United States v. Echeverry*, 698 F.2d 375 (9th Cir.1983), *modified*, 719 F.2d 974 (9th Cir.1983), this court reversed the defendant's conviction because an ambiguous jury instruction permitted the jury to convict without unanimously agreeing whether the proof showed the existence and duration of a single conspiracy or of

multiple conspiracies. 698 F.2d at 377. On petition for rehearing, the *Echeverry* court clarified its earlier opinion, stating that the jury must clearly be told that it must unanimously agree to a particular set of facts when there is a genuine possibility of juror confusion, or when different jurors may conclude that the defendant committed different acts. 719 F.2d at 975.

We find the cases cited by appellants to be inapposite to the situation before us. Here, the indictment charged only one illegal importation: the unlawful shipment into the United States of coffee originating in Honduras. That coffee was off-loaded and re-marked in Guam, but regardless whether those activities changed the identity of the coffee from Honduran to Guamanian, there was but one unlawful importation. Moreover, unlike *Mastelotto*, the evidence in this case related only to a single shipment of coffee, as charged in the indictment. In contrast, the court in *Mastelotto* found that the jurors were presented with evidence indicating the possible existence of more than the single scheme to defraud for which defendants had been charged. Thus, the *Mastelotto* panel held that the failure to require agreement on the same fraudulent scheme infringed the defendant's right to a unanimous jury verdict.

This case also differs from *Echeverry*, where the failure to hold the jury to agreement on the dates of any conspiracy or conspiracies permitted some jurors to reach conviction based on the defendant's participation as of one time frame, while other jurors could have found guilt based on a different period. In addition, some jurors in *Echeverry* could have convicted the defendant on the basis of a single conspiracy, while others could have viewed the proof as indicative of multiple conspiracies. Here, defendants were charged with only one unlawful transaction, and the proof of misconduct related only to that single transaction.

 Appellants correctly argue that the jury instruction which they challenge permitted the jurors to determine the applicable import requirements, depending on whether the coffee was viewed as being from Guam or from Honduras. They also contend, however, that because the instruction failed to require the jury members to agree on the Country of Origin, some jurors could have been permitted to convict on the basis that the import requirements for Honduran coffee were not satisfied, while others could have found illegal conduct because of noncompliance with the requirements for Guamanian coffee. We reject this argument. Although the trial court failed to expressly require agreement by the jury on the Country of Origin, we find an implied agreement that the coffee was a product of Honduras. Under the jury instruction that defined a product of Guam, no reasonable juror could have considered the Patels' coffee to be Guamanian.

Moreover, in this case the determination of the Country of Origin was not crucial to the jury's conclusion that the law was violated. In actuality, appellants did not purport to satisfy the requirements for importing coffee from either Honduras or Guam. Rather, the coffee was imported as processed agricultural beans, so it made no difference whether the coffee was a product of Guam, or a product of Honduras. Unanimity on that particular finding would not have determined the unlawfulness of appellants' actions, because whether the coffee was from Guam or from Honduras, appellants did not possess the required import documentation to satisfy the ICA.

## C. *Prosecutorial Misconduct During Closing Argument*

 Appellants also contend that the trial court erred in refusing to entertain objections to statements made by the prosecutor during closing argument. We review the conduct of the trial judge for an abuse of discretion. *United States For Use & Benefit of H & S Industries, Inc. v. F.D. Rich Co.*, 525 F.2d 760, 765 (7th Cir. 1975).

After interrupting the prosecution's closing argument for the second time, counsel for appellant was ordered by the trial court to file further objections in writing, unless

the objections were to "absolutely incorrect statement[s]." Appellants' attorney was not entirely precluded from objecting orally during closing argument, but oral interruptions were limited to those of substance. Moreover, the reporter's transcript indicates that the restrictions were imposed because the court reasoned that oral objections were being made as tactical maneuvers to weaken the prosecution's argument.

 The present situation is similar to that in *F.D. Rich Co.*, 525 F.2d 760. In that case, the reviewing court determined that the trial judge's rulings discouraging objections that had some technical bases, but which the trial court viewed as primarily tactical in purpose, did not constitute an abuse of discretion justifying a new trial. *Id.* at 765. We reach the same conclusion. Parties are entitled to reasonable latitude in argument. Limiting objections to absolutely incorrect statements where interruptions are perceived to be at least borderline, however, is within the court's discretion. In doing so here, the trial judge did not abdicate responsibility for controlling remarks that were outside the record, unduly inflammatory, or unfairly prejudicial.

Appellants also contend that improper comments by the prosecutor during closing argument justify reversal. After trial, appellants' counsel submitted a list of fifteen objections to the prosecutor's closing argument as instructed by the court. The court did not expressly rule on those objections, nor did appellants raise the issue of prosecutorial misconduct either when moving for judgment of acquittal or for new trial. However, we have reviewed them here.

 When a prosecutor's remarks are nonprejudicial, or constitute reasonable inferences from the evidence, no prosecutorial misconduct can be demonstrated. The critical inquiry is whether, in the circumstances of the trial as a whole, the remarks were so prejudicial that they likely influenced the jury adversely to the defendant and deprived the defendant of a fair trial. *See, e.g., Lawn v. United States*, 355 U.S. 339, 359–60 n. 15, 78 S.Ct. 311, 323 n. 15, 2

L.Ed.2d 321 (1958); *United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 237–43, 60 S.Ct. 811, 850–53, 84 L.Ed. 1129 (1940); *United States v. Ramirez*, 608 F.2d 1261, 1268 (9th Cir.1979) (remarks were a "zealous presentation of the Government's case" and nonprejudicial).

 Appellants refer to a statement by the prosecutor to the effect that, had the defendants processed the coffee as they represented they would do, "they wouldn't be in any of this mess." The prosecutor also commented that "the judge will tell you that Headnote 3(a) doesn't apply to quotas ... and that Joe McDonald in this fifty percent was just dead wrong." Although these remarks may have been strong, they were within the limits of argument. We cannot see that their potential impact on the jury, after considering the record as a whole, was inherently prejudicial.

Appellants also complain of comments by the prosecutor on evidence outside the record, and that "he cited nonexistent evidence regarding appellants' statements to others and argued appellants were guilty simply because they were on trial." We have found no support for these contentions, and thus conclude that appellants have failed to demonstrate misconduct sufficient to justify reversal.

### D. *Assessment of Costs*

 Appellants challenge the court's assessment of $8,920.00 against Hemant Patel for the costs of transferring the case from the Northern District of California to Guam. A court has discretion to order a convicted defendant in a noncapital case to pay the costs of prosecution. 28 U.S.C. § 1918(b); *United States v. Pommerening*, 500 F.2d 92, 101 (10th Cir.1974), *cert. denied*, 419 U.S. 1088, 95 S.Ct. 678, 42 L.Ed.2d 680 (1974). The trial court here apparently agreed with the government that costs should be assessed because the change of venue to Guam was a strategic attempt to obtain a more favorable jury, rather than a genuine attempt to avoid

inconveniencing witnesses. Appellants called only one Guam resident as a witness after venue was moved there.

We find no abuse of discretion in the trial court's decision to assess costs, nor in the amount that was actually assessed. The trial court was in a better position than we are to determine whether costs should fairly be charged against Patel. Therefore, for all the reasons discussed, the decision of the district court will be affirmed.

AFFIRMED.